The bill of complaint alleges that on March 8th, 1944, the complainant, by two deeds, conveyed certain lands to the defendant, City of Newark, for an agreed price of $3,200 per acre, plus interest thereon at 6 per cent. per annum from June 1st, 1929, to the date of the conveyance, plus taxes on the lands paid by complainant or its predecessors in title, for the period subsequent to June 30th, 1927, making a total purchase price of $264,445. Complainant shows that no part thereof has been paid and prays that the court establish a vendor's lien upon the lands in the amount of the purchase price, and enforce the lien. The city answered that the person to whom the deeds were delivered was not authorized to accept them on behalf of the city, and hence title has not vested in the city; that the contract, ordinance and resolutions on which complainant relies were invalid for failure to comply with pertinent statutes, and that the city acted in the final stages of the transaction in 1944 as a result of the mistaken belief that there was in existence an agreement legally obligating the city to buy the lands and pay the price above mentioned.
When the case came on for final hearing, the city filed, by leave of the court, a counter-claim showing that it had taken possession of the lands and expended large sums of money thereon and that they constitute a valuable public improvement. It prays that the court determine the fair and equitable value of the lands at the time of the city's taking possession thereof, and that the court decree complainant to convey the lands to the city upon payment of the value so ascertained. The pleadings contain much more, but enough has been stated to show in outline the position of the parties. The ultimate question is, what should the city pay?
The City of Newark, some years before the first World War, established a port zone on Newark Bay half a mile or so from the line of Union County, and here constructed what became known as Port Newark Terminal. Early in 1927, Mayor Raymond decided to extend the port zone southerly to the county line, and to develop the part which lies west of the Central Railroad as an airport. Mr. Edward J. Grassmann, *Page 456 
and companies controlled by him, of which the complainant is one, owned the greater part of the land to be acquired by the city for this extension. He had assembled much of his holdings at the instance of the Central Railroad Company of New Jersey in order to enable it to construct a large freight yard. In the summer of 1927, Grassmann agreed informally with Mayor Raymond to sell all his lands in the area to the city, provided he could satisfy the railroad. The freight yard would be a valuable adjunct to the port, so Mayor Raymond did not want the railroad to abandon the project but hoped it would establish the yard in Union County, just outside the port zone. The mayor and Grassmann agreed on a price applicable to all of Grassmann's land, regardless of the particular location, namely, $3,200 an acre, subject to taxes accruing after July 1st, 1927. Or if Grassmann should pay such taxes, the amount paid would be added to the purchase price. Grassmann gave the city the right to enter into possession immediately and to fill in the lands, which were then tidal swamp.
Grassmann testified that he understood the city would take title to his lands promptly, say, within 60 days, and if it should fail to do so, it would pay him interest at 6 per cent. on $3,200 an acre from about 60 days after he reached his agreement with the mayor, until the city should take title to each of his parcels. The subject of interest, however, came up again for further negotiation in 1929, and an agreement was reached with Mr. Jerome T. Congleton, who had succeeded to the office of mayor upon the death of Mayor Raymond, that no interest would be paid on the price of lands which had been conveyed to the city before June 1st, 1929, and that on conveyances after that date, interest on $3,200 an acre would run from June 1st, 1929. This was confirmed by letter of Mayor Congleton, dated July 24th, 1929.
Meanwhile, Grassmann had been negotiating with the railroad and a plan had been developed which was acceptable to the city, that the main part of the yard would be built in Union County, but the railroad would buy or retain a triangular parcel of land in the southerly part of the port zone, fanning out on each side of its railroad so as to provide access to the yard proper. *Page 457 
Pursuant to a resolution of the City Commission adopted October 9th, 1929, the city entered into a formal contract with Grassmann, dated the same day. The parties agreed that the city would purchase, and Grassmann convey or cause to be conveyed to the city, the lands shown in red or white on a plan attached to the agreement; that certain tracts containing about 25 acres which the city then owned and which the railroad needed, would be conveyed to Grassmann in exchange for the same number of acres shown in red or white; that the other lands shown in red or white would be paid for by the city "upon the same terms and conditions now existing with respect to the purchase of meadowlands between" the city, Grassmann and his companies.
The 25 acres to be conveyed to Grassmann for the railroad were within the triangle which the railroad would use as the entrance to its yard. The tracts in red or white, which Grassmann would convey to the city, comprised nearly all of his lands except hislands within the triangle.
As every Newark lawyer knows, meadow land titles present great difficulties. The city, in January, 1928, engaged Mr. Fred C. DeCamp, to supervise the examination of titles of lands bought by the city in the extension of the port zone. The Grassmann lands in the area comprised a large number of parcels, averaging some five acres each. The city accepted conveyance of a parcel, or a few parcels at a time, as Mr. DeCamp's work progressed and the money was available. Each conveyance was the subject of a separate resolution of the City Commission, which described the land with particularity and appropriated the purchase price. The first of these resolutions was adopted March 19th, 1929, a year and a half after Grassmann and Mayor Raymond had reached their agreement. Between then and October 9th, 1929, the date of the formal contract, the city took title to 166 acres of Grassmann lands, all lying more than 4,000 feet from the railroad and not including, I take it, any land which he had bought in the interest of the railroad company. After the execution of the contract, conveyances continued from time to time through 1931, and one was made in 1932, November 7th, and none thereafter. In this period, Grassmann deeded to the city 295 *Page 458 
acres shown in red or white on the plan annexed to the agreement, and 18 acres not so shown, but none within the railroad triangle. Grassmann, or rather his company, the complainant, still owns some 37 acres in the port area, namely, the land involved in the present suit.
We may recall that in the month of October, 1929, the prices of bonds and stock shares tumbled, and the country entered a period of economic disaster. The Central Railroad Company soon abandoned its plan to build the freight yard and instead decided merely to widen its road through the southerly part of the port zone to 300 feet. It bought Grassmann's lands within the 300-foot ribbon, but none of his other lands in the triangle. The city did not convey to Grassmann or the railroad the 25 acres mentioned in the agreement of October 9th, 1929. No action whatever was taken to consummate that part of the contract. Eventually, the railroad company's situation became such that the federal court placed it in the hands of receivers. They, by formal document of January 23d 1945, have formally renounced all interest in the lands which are the subject of this suit.
In 1932, or perhaps 1931, Grassmann informed Mayor Congleton of the railroad's change of plan, and thereupon they verbally agreed that he would convey to the city the land in the triangle, except the 300-foot right-of-way on the same terms which governed his other sales to the city. But no action was taken by either party to carry the agreement into effect. The same depression which made the railroad abandon its plan to build a yard, caused the city to proceed more slowly in the development of Port Newark. Then came the war. On April 1st, 1942, the city leased to the United States the airport, including all of complainant's lands, except a small parcel which is within the Sears Roebuck transaction. Complainant, on May 8th, 1942, wrote to the city, demanding payment for its land which the city had leased to the government. Then, on June 1st, 1942, the United States started to condemn property which the city, as early as 1926, had leased to the Sears Roebuck Company. A little of complainant's land is within the tract described in the condemnation proceeding and in the lease. Grassmann, on January *Page 459 
7th, 1943, wrote to the representative of the city calling attention to the fact that some of his land was involved. The whole Grassmann matter dragged along until March 8th, 1944, when the City Commission passed resolutions appropriating $264,445 for the purchase of the lands included in the Sears Roebuck condemnation and in the lease to the government. The same day, complainant executed the deeds and sent them to the office of the corporation counsel of Newark. A week later, the commission rescinded the resolutions.
The city, by its answer, sets forth that the appropriations were made and the conveyances accepted (if there was an acceptance) in the belief that the city was obligated by an existing contract made in the time of Mayor Raymond or Mayor Congleton, to pay the named sum for the land. The proofs show that the commissioners did act under such a belief and that the complainant did likewise. Even in the present suit, the complainant argues that the facts which I have outlined are sufficient to establish such a contract. In my opinion, the city was obligated by contract to pay a price calculated according to the formula which I have mentioned for some of the lands, but the city was not bound in respect to other lands described in each resolution and deed. This mistake prevents the complainant from establishing a vendor's lien for the amount mentioned in the appropriations.
Before considering further the complainant's case, let us turn to the counter-claim and try to find a basis for compensation for the lands. Generally, when a corporation having power of eminent domain goes into possession of land with the consent of the owner, and improves the land for public use, Chancery will require payment of the value which the land had at the time of the entry, and interest from that time until payment is made.North Hudson Railroad Co. v. Booraem, 28 N.J. Eq. 450. But this is not a rigid rule; the formula varies with the circumstances. In a later phase of the cited case, it was held that the allowance of interest was discretionary. 28 N.J. Eq. 593.
And in New York, c., Railway Co. v. Stanley's Heirs,35 N.J. Eq. 283, the railroad was charged, in addition to the value of the land *Page 460 
and interest, with the cost of erecting fences. What is required is "such compensation as is equitable to all parties."Huntington v. Headley, 41 Atl. Rep. 670. "The foundation of the rule in equity is its inherent justice." Baltimore and NewYork Railroad Co. v. Bouvier, 70 N.J. Eq. 158, 170. "All the rights of the landowner will be protected, and full compensation may be made, not only for the value of the land taken and the damages incident to the taking, but also for the breach of any agreement made with him, and allowance for the occupancy of the land under such agreement or by consent or license." Leeds v.Camden and Atlantic Railroad Co., 53 N.J. Law 229.
The lands involved in the present suit fell into three groups. First, 14.4 acres shown in red or white on the plan annexed to the contract of October 9th, 1929, and which the city thereby agreed to buy. Second, 20.5 acres within the railroad triangle. Last, three parcels aggregating 2.2 acres, not within the triangle and not shown in red or white on the plan. The city did not, by the contract of October 9th, 1929, agree to buy the lands in the second and third classes.
Now for the parcels in the first group, those which the City covenanted to purchase. The contract was made pursuant to the express direction of a resolution of the City Commission. It was executed by the director of that department of the city government which embraced the Port Newark project. It was carried into execution to the extent of the conveyance of nearly 300 acres, all at $3,200 an acre with interest from June 1st, 1929, and a refund of taxes. We may assume that the city would also have taken title to the remaining 14.4 acres many years ago but for the prevailing economic conditions.
The city argues that the contract was void because no appropriation had been authorized sufficient to meet the purchase price of all the land which the city contracted to buy. R.S.40:50-6. Over a long period of years, the city sold bonds in order to raise money for the development of Port Newark. The unexpended balance of the fund on hand September 30th, 1929, was $624,541. The balance seems to have been smaller on October 9th, when the contract was made, and insufficient to answer the contract in full. The statute *Page 461 
requires "an ordinance authorizing an appropriation." I am not sure what this means — whether it contemplates an ordinance limiting the over-all cost of a project, to be followed by a series of resolutions appropriating specific sums as need arises and the money becomes available. There is no proof in the case that an ordinance of the character intended by the statute had not been, or had been, adopted. However, the question now before me is not whether an action can be maintained on the contract but what price the city should pay.
It seems equitable that the price confirmed by contract and authorized by the commission is what the city should pay. Indeed, there is no suggestion that $3,200 an acre was high in 1929. The objection is to the interest item. Remember that Grassmann has had no income from the property all these years; he has been prohibited by his contract from selling it to others. It is just that he should get interest, and 6 per cent. is the rate usually allowed in such cases. The city points out that prevailing interest rates are very low to-day, but they were high in 1929. Again, if Grassmann had been paid interest annually, if it now be compounded at rates descending from 5 per cent. for the first four years to 3 1/2 per cent. the last four years, the result would be substantially the same as simple interest at 6 per cent. for the whole 16 years. The city will be required to pay the stipulated price for lands covered by the agreement of October 9th, 1929.
The lands in the second class are the parcels in the railroad triangle. Assume, as urged by complainant, that the oral agreement between Mayor Raymond and Grassmann in the summer of 1927 constituted a valid contract binding the city and Grassmann and Grassmann's companies, and that it embraced the tracts which were later set aside as the railroad triangle. Still it is obvious, and beyond argument, that so much of the agreement as affected these particular lands was rescinded by mutual consent by the contract of October 9th, 1929. Instead of buying, the city thereby agreed to sell such lands as it had within the triangle. Immediately that contract had been executed, the city was relieved of any obligation to buy, and Grassmann to sell, lands within the triangle. *Page 462 
Some time thereafter, there was again a change of intention; just when, does not appear. The city took title to several parcels which abutted the triangle and which were carved from larger tracts, parts of which were within, and parts without, the triangle. In each such case, the description in the resolution runs along the boundary of the triangle, cutting the parcel in two. An example is the resolution adopted April 15th, 1931. On that date the city still intended not to buy land within the triangle. Mr. DeCamp, who had the duty of drawing the resolution which preceded each particular conveyance, testified that after the contract of October 9th, 1929, he was instructed to exclude the land within the triangle and that these instructions were never revoked, although he remained in the city's employ until about 1937.
Mr. Grassmann, sometime in 1932, became convinced that the railroad would take nothing in the triangle save a 300-foot right-of-way, and had a conference on the subject with Mayor Congleton, Mr. Costello, the chief engineer of the city, and Mr. Hannegan, corporation counsel. Mayor Congleton was still director of the department which embraced Port Newark. Grassmann testifies that he and the mayor then agreed that the city would buy the land in the triangle outside the 300-foot line on the same terms the city had been paying for his other lands. This understanding or agreement was not authorized or ratified by any action of the City Commission; it was never presented to the commission; it was never made the subject of a memorandum of any kind by either party. The city distinctly denies that it is bound by such an agreement, were it made. Unfortunately, the three city officials named have all passed away. While I believe that Mr. Grassmann testified truthfully, I doubt that the parties intended their conversation to constitute a contract obligating the city to an expenditure that tops $75,000. I surmise that the parties were merely stating their intentions, what they expected to do when the financial clouds lifted and the city was able to proceed with the development of the port area. But whether I am correct in this or not, I am satisfied that the memory of a single interested party of what was said thirteen years ago, is insufficient to establish an obligation of this magnitude. What then does equity require the city *Page 463 
to pay? The city suggests the value of the land at the time it entered in 1928.
I have already mentioned that when Grassmann and Mayor Raymond, in 1927, reached an understanding for the sale of Grassmann's property, he gave the city leave to enter and fill in the land. The city contracted with a dredging firm to fill in most of the land within the extension of the port area, including all the land in what I have called the railroad triangle. Silt from Newark Bay was pumped onto the land and thereby the surface raised five or six feet above high tide. Just when the work was finished has not been shown, but Mr. Parsons, head of the city's engineering staff, thought it was completed before October 9th, 1929.
Grassmann's consent to an entry on the land for the purpose of improving it, created an equity against the owner for a conveyance to the city upon payment of such compensation as is equitable to all parties interested. Huntington v. Headley
(Emery, V.C.), 41 Atl. Rep. 670. But the city was at liberty to abandon its equitable claim to the triangle. Lehigh Coal, c.,Co. v. Central Railroad Co., 35 N.J. Eq. 379. And this it did when it decided to exclude the triangle from the port development and in execution of the decision made the contract of October 9th, 1929. Thereupon, Grassmann held the land freed of all equities in favor of the city. If the land had been made more valuable by the fill — as undoubtedly it had — Grassmann became entitled to the benefit.
The conversation between Grassmann and Mayor Congleton about 1932, should be so construed that Grassmann impliedly authorized the city to re-enter the land; but the city took no advantage of the license, at least until 1942. It did not improve the land, erect fences or structures of any kind, post signs, place watchmen, or do anything that could constitute an entry or a taking of possession, or an exercise of ownership or dominion.
The city has put in evidence several maps, taken from its own files. One, dated April, 1935, shows a small part of the triangle included in the area marked "Allocated for Newark Airport Development." A later map, February, 1938, shows a smaller airport, which does not touch the triangle. The only feature of the map that does enter the triangle is "Proposed *Page 464 
Terminal Street Extension." But even if the maps definitely included Grassmann's property in the Port project, they would not be a taking possession of the land. They show at most an intention to take the lands for the public use.
All our authorities agree that, in equity, compensation depends on the value of the land at the time the municipality enters and takes possession. Besides the cases already cited, see Price v.Weehawken Ferry Co., 31 N.J. Eq. 31; Doremus v. Mayor, c.,Paterson, 73 N.J. Eq. 474. Not the value at the time the city officials form an intention to construct the public improvement; not when the owner gives consent; but when the city enters and so gives the owner a cause of action.
On April 1st, 1942, the city leased Port Newark and the airport to the United States, including all the land in the triangle. About the same time, the Navy took physical possession and began extensive improvements. I find that possession was taken with the consent of complainant, since Grassmann had kept alive the permission given in 1932 by frequent endeavors through the years to get the city to act. The basis of compensation will be the value April 1st, 1942. Taxes will be apportioned as of that date, so that complainant will bear taxes prior to and including the first quarter of 1942; the city will be charged with taxes thereafter. The city will be charged with interest from the same date, but only at the rate of 4 1/2 per cent., which is about the prevailing rate for good mortgages. It seems equitable to depart from the usual 6 per cent. rate in this instance.
The value to be found is market value, what a willing buyer would pay in cash to a willing seller. In reaching the market value, consideration must be given to all uses to which the land may be put, and the owner be given the benefit of the best and most valuable use. But the special value of the land to the city, or to the United States, as distinguished from others who may or may not have power to condemn, must be excluded. The value of the land in 1942 was doubtless affected by the adjacent airport, seaport, and railroad. The city must pay the value as enhanced or depressed by this factor. On the other hand, from 1932 on there was a probability *Page 465 
that complainant's land would be taken by the city for an extension of its public improvements. That likelihood may well have given an increase to what a speculator would have been willing to pay for the land. The city ought not to pay such increase. State Highway Commission v. National FireproofingCorp., 127 N.J. Law 346; United States v. Miller, 317 U.S. 369;63 Sup. Ct. 276.
There remain for consideration three small parcels which were not among those included in the contract of 1929. Complainant argues that the oral agreement of 1927 between Grassmann and Mayor Raymond remained in effect as to these parcels, despite the formal contract of October 9th, 1929. In 1927, Grassmann agreed to sell all his lands in the area, subject to a vague reservation in behalf of the railroad company. He owed a moral duty to the railroad company, perhaps a duty enforceable in equity, and he did not purpose to evade it. The matter of interest was also left in an unsettled state and so remained until July, 1929. By negotiation with the railroad, its claims were reduced to the triangle. Then came the written contract whereby Grassmann agreed to convey certain lands which appear to have totaled 310 acres, and to have included all his lands not theretofore deeded to the city, except those in the triangle and except about 20 acres additional. The writing did not state the purchase price but only referred to the "same terms and conditions now existing."
The rule is well established that when the parties to an oral agreement adopt a writing as the final and complete expression of their agreement, the writing supersedes the prior oral agreement. Where the writing is incomplete on its face and refers to the oral agreement for certain terms, in this case the price, the oral agreement remains effective to that extent but the written contract becomes the sole memorial of that part of the agreement which it purports to embody. But complainant says that the written agreement in question does not cover all the land to be conveyed. If Mayor Raymond in 1927 had made two promises, namely, one to buy the parcels which were later covered by the written agreement, and another to buy the twenty acres which were not included in the written contract; then it could well be said *Page 466 
that the oral agreement for the twenty acres remained in effect after the other one had been integrated in the writing. But actually there was only one agreement made in 1927, for all the lands and for a price per acre, applicable to all alike. The written contract for a slightly smaller acreage, must be taken as the final expression of intention of the parties. Naumberg v.Young, 44 N.J. Eq. 331. Restatement — Contracts, §§ 228 et seq.;Williston — Contracts, §§ 628 et seq.; Wigmore — Evidence, §2430. The city was thereby absolved from the duty to take the twenty acres.
There is the possibility of mistake. The written contract does not itself describe the lands to be conveyed but instead refers to an annexed map on which they were marked with crayon. There are indications that the marking was not done with exact care. Several parcels were included which had already been conveyed to the city, but this may only indicate that the map had been prepared some time in advance. Of the parcels which were not included but yet were afterward conveyed to the city, or are still owned by complainant, several parcels lie on the boundary of the zone of public improvements. It may readily be supposed that the city, in 1929, did not want these lands. But among the parcels not covered by the contract of 1929 are two lots which the city took title to in 1931, and one which complainant still owns, which are surrounded by lands, shown in red or white on the map, that the city agreed to buy. I can think of no reason why they were omitted and have no doubt it was an oversight. However, the city has not been heard on this point. Unless the city objects, the parcel last referred to, a one-acre lot marked FAI on one of the exhibits, will be paid for in the same manner as if it were included in the contract. The other two lots will be paid for on the same basis as the land in the triangle.
The price which the city must pay is the same whether the deeds executed in 1944 vested title in the city or whether they did not; whether the case be considered on the bill under the heading vendor's lien, or on the counter-claim for equitable condemnation. In order to avoid the question of title, the deeds may be redelivered or confirmatory deeds may be given. *Page 467