128 N.J. Super. 370 (1974)
320 A.2d 186
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT,
v.
S. NALBONE TRUCKING COMPANY, INC., ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued April 22, 1974.
Decided May 24, 1974.
*371 Before Judges LEONARD, ALLCORN and CRAHAY.
Mr. Jonathan M. Heilbrunn argued the cause for the appellants (Heilbrunn, Tabman, Josephs, Finkelstein, Heilbrunn & Garruto, attorneys).
*372 Mr. Alan B. Rothstein, Deputy Attorney General, argued the cause for the respondent (Mr. William F. Hyland, Attorney General, attorney; Mr. Richard M. Conley, Deputy Attorney General, of counsel; Mr. Bertram P. Goltz, Jr., Deputy Attorney General, on the brief).
The opinion of the court was delivered by ALLCORN, J.A.D.
Defendant-owners appeal from a condemnation award, on a jury verdict.
The land condemned consisted of the whole of a single tract of land, containing approximately 339 acres. For some years prior to the taking it had been used principally as a farm; more recently, it had been utilized also, in part, for the excavation and sale of dirt fill; and, latterly, it had been used exclusively for the excavation and sale of fill.
In the course of the trial in the Law Division, the State employed Joseph A. Martin as its real estate expert. On his direct examination, and as a foundation for his opinion as to the market value of the condemned premises as of the taking date (October 5, 1971), Martin testified as to the details of sales of certain properties which he deemed to be comparable to the condemned property. Among such comparable sales upon which Martin placed reliance was a sale of the condemned premises themselves. That sale, which took place in June 1970, some 15 to 16 months prior to the date of taking, was made by the then owners (Matheson) to defendant Nalbone Trucking Company, for the sum of $325,000  i.e., 339 acres at approximately $959 an acre. He equated this price with a per acre value of $1,102 as of the date of taking, adding 15% to the sale price to reflect the general increase in land values occurring between the sale date and the taking date. On the basis of this sale as adjusted, and the adjusted sale prices of five other properties that he also used as comparables, Martin concluded that the market value of the condemned premises as of the date of the taking was $1,300 an acre, for a total value of $440,000.
*373 The two real estate experts called by the owners estimated the date of taking per acre value to be $1,400 (Kenneth A. Walker, Jr.) and $1,750 (Ronald A. Curini), on the basis solely of comparable sales. Each of them was of the further opinion that such values should be doubled by virtue of the municipal permit previously granted authorizing the excavation and removal of fill from the condemned premises, to $2,800 and $3,500, respectively. (Both experts also rendered opinions as to market value based on the income that reasonably might be expected from the excavation and sale of the quantity of fill estimated to be available from the premises. Using this approach, Walker arrived at a value of $2,050,000, and Curini at a value of $2,300.000.)
The jury awarded the owners the sum of $508,500, a per acre value of $1,500.
The seed of the principal issue on this appeal was implanted by counsel for defendant-owners during his cross-examination of the State's real estate expert. In the course of the interrogation counsel questioned the propriety of the use of the 1970 sale of the condemned premises as a valid and bona fide comparable sale on several grounds  among them, the effect upon the sale price of the announcement by the State of its proposed plan for a Green Acres project which contemplated the taking of these premises, some 15 to 20 years before the actual taking. In response to counsel's questioning, Martin testified that it had been "a known fact since the early 1950's" that the premises were "subject to a taking by the Department of Environmental Protection," but that such knowledge would have no effect whatever "on the purchase price between Nalbone" and its grantors. This was the first occasion on which the subject was introduced at the trial.
Thereafter, following the conclusion of the State's direct case, counsel for the owners continued to pursue the matter in his presentation of the owners' case. The first witness, Frank P. Matheson (one of the grantors in the 1970 sale), testified on direct that he had "knowledge of the proposed Green Acres acquisition" of his property as early as "around *374 1953." Pasquale J. Nalbone, secretary-treasurer of defendant Nalbone Trucking Company, testified that at the time of the purchase of the property in 1970 he "had no knowledge that the State might acquire the property."
Additionally, both of the owners' real estate experts testified that the 1970 sale of the premises condemned was not usable as a comparable sale by reason of the State's earlier announcement of its contemplated acquisition under the Green Acres program: because "of the land being labeled Green Acres land," according to Walker; because the property was "almost blighted by the New Jersey Environmental Protection Agency for a period of time," in the words of Curini.
In his charge the trial judge preliminarily instructed the jury that its function was to determine and fix the fair market value of the premises as of the date of the taking, from all of the evidence presented to it. Noting that the jurors had the "testimony * * * and evaluation" of the real estate experts to assist them in making such determination, the judge continued:
* * * They gave you different opinions concerning their evaluation of the property. Each of them, Mr. Martin, Mr. Walker and Mr. Carini [sic], approached it in one regard. All three of them used one approach of valuation and then Mr. Walker and Mr. Carini also testified for your benefit as to two other approaches which they used. All of that is their opinion placed before you to assist you in deciding what you feel the fair market value of the property to be. Each of them used what they described as the market data approach based on comparable sales, and what they are saying to you is this: I cannot precisely tell you what that particular piece of land is worth but what I can tell you jurors is that there are other similar kinds of land in the area upon which there were sale prices freely agreed upon by a buyer willing to buy and a seller willing to sell and from those prices of comparable properties similar in nature to this property I then as a real estate man derived an opinion as to what I think the per acre price of that property should be, what the fair market value of it should be. * * *

* * *
Now, one of the questions in the case I think you will have to consider really is whether or not the sale from Matheson to the Nalbone people was a valid sale. The sale was just about a little over a year *375 before the date of the taking. The sale by Mr. Matheson to Mr. Nalbone was on June 22, 1970. It is agreed that that sale was for $325,000.00. The date of the taking was on October 5, 1971. If that was a legitimate sale, if it was a buyer willing to buy and a seller willing to sell with no compulsion either way, then certainly that price, that sale price within a year or so of the date of taking would be evidence as to what the value of land was. That doesn't mean that you are bound by this as the valuation but it is evidential. It bears upon the valuation you will come to. Is that a legitimate sale? Is it a comparable sale as the experts testified here? Mr. Martin thought it was, Mr. Walker and Mr. Carini both rejected it. The reason for rejection was that they felt based on their conversation with Mr. Matheson particularly that he was under some sort of pressure to sell and that therefore he sold at a reduced price and that therefore the $325,000.00 does not represent a legitimate figure for that property as of June 22, 1970. Mr. Martin thought it was a legitimate figure and could be used as a comparable sale. Well, you have to evaluate. Was Mr. Matheson under compulsion of some sort? You heard his testimony. You make your evaluation as to whether there was or not, whether this was a fair value or not a fair value at the time of that sale. Mr. Matheson also testified that the property had been on the market for I think about five years at 1500  $1600.00 an acre, rather, and eventually sold for something less than that. Does that indicate it was or was not a fair sale?
There is also a question of what would be in the minds of a buyer willing to buy this property on October 5, 1971 and seller willing to sell the property as of October 5, 1971. Certainly as far as back in 1970 when Mr. Matheson sold it he was aware of the Green Acre taking. That was something that was reasonably to be anticipated in the future, and reasonably to be anticipated then would be that any extraction of materials from the property would come to an end when the Green Acres taking took over, when the State took the property. That was certainly a factor he had in his mind. In fact, he knew about it. In fact, he said he told the real estate broker when he had the property on the market that was so. There is a question whether that was in the Nalbone people's minds when they bought the property from him in 1970 that bears upon the fair valuation of $325,000.00, too, whether they felt some sort of use of this property would be limited in the foreseeable future by that factor which was there in the background. So you will have to evaluate what effect, if any, the Green Acre taking had on the legitimacy of the sale between Matheson and Nalbone and then what effect that would have on the value of the property as of October 5, 1971, if any. [Italics added.]
On this appeal defendant-owners contend that the trial judge committed prejudicial error by the inclusion in his charge of the portion above italicized. It is asserted that, in so *376 doing, the judge thereby instructed the jurors "that they had the right to consider the value of the subject property based upon the knowledge that it was ultimately to be acquired by the State of New Jersey," and that "the State * * * should not be permitted to benefit by depressing the values of real estate through the threat of condemnation."
At the outset, we are not at all certain that we agree with defendant's interpretation of the cited portion of the charge  despite the comments of the trial judge at the time the exception was taken. A reading of the phrase in the context in which it appears, particularly with reference to the preceding portions of the charge, would indicate that the jurors could have construed these words as having but one meaning  namely, that once the jury decided whether the prior announcement of the proposed taking had or had not affected the validity of the 1970 sale as a comparable then, dependent upon its finding in this regard, the jury must next determine the weight, if any, to be accorded the 1970 sale in its effect upon the market value of the premises at the time of the taking.
Such interpretation accords also with the theory of this aspect of the case as it was presented by defendant-owners at the trial, and with the evidence adduced by defendant-owners in support thereof. The issue of the depreciating effect of the prior announcement by the State of the projected taking was initially introduced and subsequently pursued by defendant-owners, only as it affected the bona fide nature of the 1970 sale and its usability as a comparable sale.
The prior announcement of the proposed taking never was urged by the owners as an influence that tended to depreciate the market value of the premises as of the date of the taking, indpendent of and apart from its effect upon the use of the 1970 sale as a comparable. In keeping with this position, the owners offered not a scintilla of proof as to either the dollar amount or the percentage by which the market value of the premises had been depreciated as of the date of the taking, as a result of the prior announcement. *377 Nor did the owners request of the trial judge any instruction to the jury with regard thereto.
Be this as it may, and assuming that the challenged portion of the charge did have the connotation ascribed to it by defendant-owners, we discern no resultant prejudice to the owners in any event. This, even postulating the proposition that a landowner should be entitled to compensation for any decline in the market value of land ultimately condemned which occurs between the time of the announcement of the projected taking and the time of the actual taking, which is attributable to the announcement. 4 Nichols, The Law of Eminent Domain (rev. 3d ed. 1971, and April 1974 cum. supp.), § 12.3151; Annotation, "Condemnation  Depreciation in Value," 5 A.L.R.3d 901 (1966). Cf., Jersey City Redevelopment Agency v. Kugler, 58 N.J. 374, 379, 383-384 (1971); East Rutherford Industrial Park v. State, 119 N.J. Super. 352 (Law Div. 1972).
Whatever may have been the depreciating effect (if any) upon the market value of the condemned premises resulting from the prior announcement of the proposed taking, defendant-owners benefited from it to the same or greater extent at the time they purchased the premises in 1970. And, just as an owner is not entitled to benefit from an enhancement in value as a result of a previous announcement of a proposed taking, 4 Nichols, supra, § 12.3151[1]; Annotation, "Condemnation  Damages  Enhanced Value," 147 A.L.R. 66 (1943); Jersey City Redevelopment Agency v. Kugler, supra, 58 N.J. at 379, so a landowner who has not been damaged by the depreciating effect of such prior announcement is not entitled to reap a windfall. If there were any doubt that defendant-owners were not damaged as a result of any such depreciating effect, it is at once dispelled when it is observed that the amount awarded the owners by the jury ($508,500) exceeded the price paid by them for the premises just 16 months earlier ($325,000) by the sum of $183,500  more than 56% over and above the 1970 purchase price.
*378 We find no merit in the remaining contentions urged by defendant-owners on this appeal. Without regard to the propriety of characterizing as an "income approach," the valuation theory of the defendant-owners' experts based upon the sale value of the fill, the trial judge would have committed error had he acceded to the owners' request to charge the jury that "the income approach is the only realistic method of evaluating mining properties." New Brunswick v. N.J. Div. of Tax App., 39 N.J. 537, 543-544 (1963); Ringwood Co. v. North Jersey Dist. Water Supply Comm'n, 105 N.J.L. 165 (E. & A. 1928); Knox Lime Co. v. Maine State Highway Comm'n, 230 A.2d 814 (Me. Sup. Jud. Ct. 1967); 4 Nichols supra, § 13.22.
Similarly, with respect to the owners' request to charge that "as a matter of law, the highest and best use of the property was for mining purposes." The determination of the highest and best use is for the jury to make on all the evidence submitted. 4 Nichols, supra, § 12.314. Nor do we find any error in permitting rebuttal testimony by the State regarding sales not set forth on the lists of comparable sales that were exchanged between the parties prior to trial, in light of the limited and special purpose for which they were admitted  namely, to challenge the thesis that land for which there had been granted a permit to excavate fill was worth twice the value of the same or similar land without such permit.
Affirmed.