240 N.J. Super. 529 (1990)
573 A.2d 953
STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANSPORTATION, PLAINTIFF-APPELLANT,
v.
THE INHABITANTS OF THE TOWN OF PHILLIPSBURG, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 31, 1989.
Decided April 26, 1990.
*530 Before Judges DEIGHAN, R.S. COHEN and BROCHIN.
Alice S. Thiele argued the cause for appellant (Peter N. Perretti, Jr., Attorney General, attorney; Michael R. Clancy, *531 Deputy Attorney General, of Counsel; Alice S. Thiele on the brief).
Thomas S. Ferguson argued the cause for respondent (Thomas S. Ferguson, attorney; John C. Musarra on the brief).
The opinion of the court was delivered by DEIGHAN, J.A.D.
Plaintiff State of New Jersey by the Commissioner of Transportation (State) appeals from a judgment entered on June 21, 1988, in the amount of $186,450.88, in a condemnation action involving lands of defendant, the Inhabitants of the Town of Phillipsburg (defendant or Phillipsburg). The condemnation proceeding was commenced under the provisions of the Eminent Domain Act of 1971, N.J.S.A. 20:3-1 et seq. (Act).
On October 18, 1984, a declaration of taking was filed by the State and a deposit was made with the Clerk of the Superior Court for the taking. The matter was initially heard by three appointed commissioners who determined the value of the taking to be $36,873. Phillipsburg appealed to the Law Division and applied for a jury trial. The State presented three motions in limine: (1) to strike the 1987 appraisal of defendant's expert and to exclude his 1986-1987 comparable sales; (2) to preclude testimony of defendant's appraiser evaluating the Phillipsburg portion of the taking as subdivided approved lots, and (3) to suppress testimony by defendant concerning noise damages to its remaining vacant land as a result of the proximity of Route 78. The latter motion was granted but the first two motions were denied.
After a jury verdict for $186,415.88, the State moved for a new trial on the grounds that the verdict was against the weight of the evidence and that there was clearly a miscarriage of justice under the law. The trial judge denied the State's motions.
*532 The following essential facts were developed at trial. At the commencement of this action, the State acquired in fee 8.048 acres of vacant land owned by Phillipsburg together with a bridge abutment easement of .073 acres. The land was to be used for the construction of Interstate Route 78 in Warren County. This final section of Route 78 in New Jersey commenced at the existing western end of the route in Greenwich Township, Warren County, and continued in a southwesterly direction through parts of Pohatcong Township, Alpha Borough and the Town of Phillipsburg to a new bridge across the Delaware River.
Of the 8.048 acres taken in fee, 1.957 acres are located in Phillipsburg and 6.091 acres are located in Pohatcong. The bridge easement encumbers land in Phillipsburg. The vacant land contains no public water, sewer lines, streets or other improvements. Prior to the State's taking, defendant owned a 41.918 acre parcel of land. Of this total, 38.7 acres were located in Pohatcong and 3.218 acres in Phillipsburg. As a result of the taking, the remaining property was separated into three parcels: (1) a northern remainder in Phillipsburg of 1.255 acres which was encumbered by the bridge easement; (2) a southwestern remainder of 19.830 acres which was sold by defendant in 1987 to the Penn Farm Group, and (3) an eastern remainder in Pohatcong of 12.785 acres.
The land in Phillipsburg was zoned R-504A, residential, with a minimum lot area for a single-family house of 5,000 square feet with a 50-foot frontage. It required sewer and city water for development. The permitted uses were: detached single-family residences, parks and playgrounds, public buildings, religious facilities, charitable organizations and necessary public utilities and services.
The Pohatcong portion was zoned R-3A with permitted uses of one-family dwellings on 65,000 square feet lots with well and septic systems, and other uses such as religious facilities, farming and parks. The R-3A zone also had conditional uses *533 of cluster residential development and planned unit development (P.U.D.) on minimum size parcels of 50 acres. A mixed, residential, commercial and business use was permitted under a P.U.D. There was also a planned unit residential development (P.U.R.D.) conditional use available on parcels of 25 acres or more. Public water and sewer service, which were not available, were required for all conditional use development.
The State presented three expert witnesses: Francis A. Goeke, P.E., an expert on sewer and water issues; Susan S. Gruel, a professional planner, and Linford L. Collins, a professional appraiser.[1] Defendant presented two witnesses: Peter J. Miller, Phillipsburg Town Manager and Robert L. Holenstein, a professional appraiser.
Due to zoning requirements of sewers and public water for residential development in Phillipsburg and for conditional use development in Pohatcong, a question was presented concerning the probable availability of sewer and water on September 21, 1984, or thereafter. The engineer, Goeke, gave his opinion that sanitary sewers were not available to be extended to new developments. The Phillipsburg sewer plant was not in good condition. In 1981, the United States Environmental Protection Agency (EPA) required Phillipsburg to clean up the plant, and to that end, a consent order was entered. Phillipsburg did not comply with the order and on August 12, 1985, a sewer moratorium was imposed by the New Jersey Department of Environmental Protection (DEP). In March 1988, Phillipsburg still had not complied with the cleanup schedule and consequently, an administrative consent order was entered which established a new schedule for completion of the cleanup of the existing plan by 1992. In Goeke's opinion, the DEP could not have issued sewer permits in September 1984 for new development. Further, *534 the sewer plant capacity was not available because during rain storms the plant exceeded technical capacity.
Goeke also testified that the existing Garden State Water Company lines near the subject property had only limited capacity and would have to be upgraded to comply with fire insurance regulations. In addition, a 1966 Sewer Agreement between Phillipsburg, Pohatcong and Alpha, which was still in effect on the date of trial, did not cover defendant's land in Pohatcong. Goeke also estimated costs to upgrade the sewer and water lines and extend them to the subject property.
To counter the State's testimony on the unavailability of sewer and water, defendant presented a fact witness, Peter J. Miller, who became town manager of Phillipsburg in January 1984. Miller admitted that, when he was appointed, the 1981 consent order to clean up the Phillipsburg sewer plant was still in effect. He nevertheless testified that there were no limitations on the sewer plant in 1984. He opined that there was nothing to prevent the sewer plant from adding new customers.
On cross-examination, Miller admitted that raw sewerage with only manual chlorination was still discharged into Pohatcong Creek during heavy rains and that when there was a power outage, the plant did not function properly. He acknowledged that Phillipsburg was penalized for failure to cleanup the plant by July 1, 1988 under provisions of the federal Clean Water Act of 1972. Miller confirmed that the 1966 sewer agreement was still in effect and had been modified only by a change in fees.
Susan S. Gruel, P.P., analyzed the property in question from a planner's perspective. She outlined the property's history from the time it was acquired by defendant in 1961 and concluded that the land in Phillipsburg had never been subdivided. Although prior owners laid out the lots, and lots were sketched in on the Phillipsburg tax maps in the 1950's, no formal subdivision was ever made.
*535 Gruel concluded that the highest and best use for the Pohatcong section was the zoned permitted use for single-family dwellings on 1 1/2 acre lots with individual wells and septic systems. There were no environmental restraints on this use. All conditional uses, cluster, P.U.D. and P.U.R.D., required public water and sewers which, she concluded, were not available in the near future.
Finally, Gruel determined that there was no market for housing on September 21, 1984. She studied population trends, building permit information and employment statistics and found no demand between 1980 and 1984 for housing either in Phillipsburg or Pohatcong.
The appraisers presented by the State and defendant agreed on only one point, i.e., that the land in Pohatcong without availability of sewer and water was valued at $3,800+ per acre. The State's appraiser, Lindford L. Collins, determined that the highest and best use for the subject property would be to sell it in its entirety for future residential development in accordance with zoning regulations. His analysis of sales in the area indicated that the real estate market was inactive and had been so since 1979 due mainly to high mortgage rates which depressed market value into 1985. He pointed to a 1985 comparable sale to show this lack of change.
Collins relied upon information received from Phillipsburg that sewer and public water were available and, therefore, valued the subject property initially assuming this availability. He arrived at a value of $4,500 per acre for the fee taking and $285 for the small bridge easement for a total just compensation of $36,500 for the entire taking. He made his appraisal subject, however, to an engineering report. Assuming unavailability of sewer and water, 15% would be subtracted from the value for a per acre price of $3,825 for a total compensation of $31,070 as of September 21, 1984.
Defendant's appraiser, Robert L. Holenstein, divided the effected lands into two areas: Section I, consisting of the ten lots *536 in Phillipsburg and Section II, consisting of 38.598 acres in Pohatcong. He prepared two appraisals: the first dated February 6, 1985 was prepared shortly after the valuation date and used all pre-taking sales. His second appraisal, dated January 20, 1987 revalued the Pohatcong part of defendant's land based on 1986-87 post-taking sales.
Holenstein appraised the Phillipsburg area on the basis that ten building lots were available. As a result of the State's acquisition, he concluded that eight lots were lost and an additional lot was damaged 100% as a result of the acquisition of the bridge easement. Holenstein based his lot method on the assumption that the lots sketched on the town's tax maps were in fact subdivided lots. His determination of just compensation for the Phillipsburg section was $76,500, i.e. $68,000 for the fee taking (loss of eight lots at $8,500 per lot) plus $8,500 for the easement. He predicated this value on four sales of improved building lots in Phillipsburg which had an average value of $19,062. Holenstein then estimated $11,000 to $13,000 for improvement costs which were not in his appraisal.[2]
Holenstein valued the Pohatcong section of the subject property based on the "new sales evidence" in the second appraisal. Over the State's objection, the trial court permitted him to use both his before and after sales in his 1987 report. Holenstein found a highest and best use for multi-family housing. He assumed that sewer and water were available. In his 1985 appraisal, made 4 1/2 months after the taking date, he had valued the Pohatcong area before taking at $8,000 per acre for a value of $308,784. The 1987 appraisal increased the before value to $469,351, an increase of $160,567. Holenstein acknowledged on *537 cross-examination that he based his 1985 value on information available then and his 1987 value on new information. He agreed with the State's expert testimony that in September 1984, there was an inactive real estate market in Warren County with little demand and high mortgage interest rates; in 1986, the market was booming, caused by lower interest rates and the opening of the eastern section of Route 78 to Newark.
Holenstein's valuation of the Pohatcong remainder was predicated on a change in the highest and best use from multi-family development to single family development on 1 1/2 acre lots. In his 1985 after value for the 19.830 acre southwester remainder was $2,000 per acre. This was changed to $11,430 per acre in the subsequent 1987 appraisal. This increase in value was based on a sale by Phillipsburg of the southwestern remainder in 1987 to the Penn Farm Group for $291,025, or $14,675 per acre. The $11,430 per acre after value for the southwestern remainder reflected a 6% damage factor, i.e., $730 per acre ($12,160 - $11,430) for a total damage to this 19.830 acre remainder in the southwestern sector of $14,475. The damage was predicated on a need to travel further to reach the remainder after construction of Route 78. Based on the 1987 appraisal, Holenstein determined a before fair market value for the easterly sector of $554,351 and an after value of $281,039 thereby estimating just compensation at $273,312, rounded up to $273,500 for the 6.091 acres. The jury found the total compensation of $186,415.88, broken down as follows:

 6.091 acres X $7,630 per acre = $46,474
 8 lots X $8,500 per lot = 68,000
 Bridge easement 8,500
 Southwest remainder damages 14,475
 Easterly remainder damages 48,966

On appeal the State contends that the trial court erred: (1) in permitting expert testimony to evaluate vacant land as building lots and charging the jury that it could base value of the land as lots, and (2) by allowing testimony evaluating the Pohatcong land based on post-taking sales which were concluded in a *538 changed, unforeseeable real estate market. Additionally, the State contends that (3) the damage attributable to the southwestern remainder are non-compensable as a matter of law, and (4) the jury verdict was against the weight of the evidence.

I
Prior to trial, the State moved to exclude testimony of defendant's appraisal expert, Holenstein, which evaluated the Phillipsburg portion of the acquisition as if building lots had been taken. Holenstein appraised this area before the condemnation as if 10 approved building lots were available and, as a result of the State's acquisition, eight building lots were lost and an additional lot was damaged 100 percent as a result of the bridge easement acquisition. The State argued that the land was raw, unsubdivided land and, therefore, could not be valued as if subdivided into building lots. The State contends the trial court committed reversible error in permitting expert testimony valuing the subject property as building lots and then charging the jury that it could value this land on a lot basis.
The trial court first agreed with the State and held "as a matter of law that the subdivision was not in fact approved so that the land itself was not divided into building lots."[3] Phillipsburg had argued that when it purchased the land from the bankrupt developers 1961, it was subdivided into lots and that these lots had been placed on the town's tax maps.[4] The State noted that there was no record of an approved subdivision of *539 this property and there was no proof of any proposed subdivision. The reference in the deed contained only a metes and bounds description of the perimeters of the property conveyed.
The trial court first charged the jury:
In this case I directed you that you should value the land acquired by the State in the Town of Phillipsburg as vacant unsubdivided land. You should not consider the value as of September 21st 1984 as individual subdivided building lots. I find as a matter of law that on September 21st, 1984 there was not a valid subdivision in effect insofar as that land.
The court then gave the jury a verdict sheet with special interrogatories. As a part of these interrogatories, if the jury found that the highest and best use for the Phillipsburg portion of the taking was individual building lots, the court directed that it could value the property as individual lots. The jury returned the following verdict concerning those specific instructions:
1. Fee Takings

* * *
B. Do you find that on September 21, 1984 (the date of the taking) the "Highest and Best Use" for the 1.957 ± acres of land located in the Town of Phillipsburg was individual lots?
 Yes X No ____
If Yes, go on to Question C. If No, go on to Question D.
C. The lots in Question #1B had a value, as of the date of taking, in the sum of
 8 lots X $8,500 per lot = $68,000
Go on to Question #2. Do not answer #1D

* * *
2. Bridge easement which is .073 acres in size $8,500

II
The courts of New Jersey have consistently held that proof must be limited to the present condition of the land and have excluded speculative testimony as to value or damages to the remainder if the property were improved or changed at a future date. Manda v. Orange, 82 N.J.L. 686, 689, 82 A. 869 *540 (E. & A. 1912); accord In re Morris & Cummings Dredging Co., 96 N.J.L. 248, 252-253, 119 A. 308 (E. & A. 1921); Ringwood Co. v. North Jersey etc. Comm., 105 N.J.L. 165, 172, 143 A. 369 (E. & A. 1928); State Highway Comm. v. National Fireproofing Corp., 127 N.J.L. 346, 351, 22 A.2d 268 (E. & A. 1941). In Manda, the Court of Errors and Appeals held:
While the rule is that the landowner is entitled to receive the "fair price for any use for which it has a commercial value of its own in the immediate present, or in reasonable anticipation in the near future" (Currie v. Waverly and N.Y.B.R.R. Co., 23 Vroom 381 [20 A. 56]), yet that concerns the present market value, having the reasonably anticipated use in view, quite a different matter, however, from laying out the property in lots upon a map, estimating the costs of putting upon it the improvements of a city and calculating what the value would be if such improvements were actually made. Such proof was condemned in N.J.R. & T. Co. v. Suydam, 2 Har. 25, and also in National Docks v. Pennsylvania Railroad (in the Supreme Court), 28 Vroom 265 [31 A. 462], where, in a dissenting opinion, Mr. Justice Lippincott made use of this argument:
The jury cannot say what the abutments would cost at some future period of time. Neither the court nor the jury could determine this, and it cannot be of value in the proper determination of the amount of damage to know what some particular structure if built upon a certain site would cost now, and it is beyond question that the court and jury are to determine judicially what are not the present value of the land and the present damages sustained by the taking.
The reasoning of the learned justice commends itself to us. [82 N.J.L. at 689, 82 A. 869.]
The holding in Manda limits proof to the present condition of land and uses to which it is naturally adapted but excludes speculative and possible uses if improvements and changes were made. Collateral matters involving calculation of cost and profits are too remote. Ringwood Co., 105 N.J.L. at 172, 143 A. 369. The court upheld the ruling of the trial court in excluding the offer of testimony to show what expenses would be necessary to drain the property in order to render it suitable for building purposes, and the costs of building streets through it, including grading, paving of streets and installing storm sewers and sanitary sewers. Manda, 82 N.J.L. at 688-689, 82 A. 869. See, In re Morris & Cummings Dredging Co., 96 N.J.L. at 252, 119 A. 308.
*541 In State v. Gorga, 26 N.J. 113, 138 A.2d 833 (1958), the court held that permissive uses under a zoning ordinance bear crucially upon value of the property. Id. at 116, 138 A.2d 833. The court noted that fair market value "may be measured by the price which, in all probability, would be agreed upon in fair negotiations between an owner willing (but not forced) to sell and a buyer willing (but not forced) to buy." (Emphasis supplied.) Id. at 115, 138 A.2d 833; accord, City of Trenton v. Lenzner, 16 N.J. 465, 476, 109 A.2d 409 (1954). While the fact that the premises were zoned residential at the time of taking is material and relevant on the question of usability of the land, State v. Speare, 86 N.J. Super. 565, 581, 207 A.2d 552 (App.Div. 1965), "the opportunity for unbridled speculation is apparent." Gorga, 26 N.J. at 116, 138 A.2d 833.
Obviously, no one would buy a lot with paper streets, no water, sewer, electric or other improvements as improved lots. An individual purchaser could never afford to extend the water and sewer and paved street for the purchase of a single lot. Moreover, the municipality could never issue a building permit for the purchase of a lot under the Municipal Land Use Law, N.J.S.A. 40:55D-1 et seq., without complying with the subdivisional requirements under that Act.[5]
Thus, where the landowner has tendered evidence of a proposed or possible subdivision, attempting to establish the number or value of individual lots and where the evidence indicates that the developer had not made affirmative efforts before the condemnation to effectuate the development of the subdivision, the evidence has been held to be inadmissible in most of the *542 cases. Annotation, "Admissibility of Evidence Proposed or Possible Subdivision or Plating of Condemned Land on Issue of Value in Eminent Domain Proceedings," 26 ALR 3d 780, 787 (1969). The courts frequently reason that since so many factors impinge upon the future value of prospective lots, not the least being the future condition of the market, such evidence is too speculative to be considered, and would tend to permit the trier of fact to surmise the value of the land at an indefinite future date. Ibid. This violates the general principle that value is to be determined as of the date of the taking. Ibid.[6] Thus, it can readily be seen that the subdivision of a parcel of land is not merely a matter of drawing lots on a plan with paper streets.
Here, the trial judge correctly ruled as a matter of law that the property located in Phillipsburg was vacant undivided land. The court then gave a contradictory charge to the jury and submitted a special interrogatory for them to find the value of some nine lots which had merely been laid out and sketched on plans with no further efforts to subdivide the tract.
The trial court committed reversible error by permitting the valuation of the vacant land located in Phillipsburg as if it were divided into building lots at the time of the taking on September 21, 1984. It compounded the error by charging the jury that it could value the land as individual building lots. Thus, the jury *543 verdict evaluating eight lots at $8,500 per lot for a total of $68,000 and the bridge easement of $8,500 must be vacated.

III
The State contends that the trial court erred by allowing testimony evaluating the Pohatcong land based on post-taking sales which were concluded in a changed, unforeseeable real estate market.
Both parties acknowledge that there was an obvious growth pattern in the area based on public hearings as to the route of I-78 which took place in 1983 as well as the publication of an official map showing the proposed route through the subject property. Moreover, both parties acknowledge the influence of inflation on property values and a decrease in mortgage rates from a peak of 15% or 20% to 10% or 10 1/2% through 1984, produced a demand for real estate.
Defendant's appraiser testified as to nine sales of property comparable to the Pohatcong section which is referred to by the parties as Section II. Two of these sales were in 1980, four years prior to taking; the remaining seven sales were after the taking on various dates between May 1985 and February 1987. The date of taking was October 18, 1984. Based on Phillipsburg's 1987 sale of the southwestern section to Penn Farm Group, defendant's appraiser increased his evaluation of the remaining land in Pohatcong from $2,000 per acre in his 1985 report to $14,675 per acre with a discount factor reducing his net valuation in the second report to $11,430 per acre.
"The general rule is that any enhancement in value which is brought about in anticipation and by reason of the proposed improvement is to be excluded in determining the market value of such land ...," but there is authority to the contrary. 4 Nichols, The Law of Eminent Domain, § 12:3151 at p. 12-415 (Rev'd 3 ed. 1978, Rohan Recompilation 1983). New Jersey supports this general proposition. Jersey City Redevelopment Agency v. Kugler, 58 N.J. 374, 379, 277 A.2d 873 (1971); *544 accord, Housing Auth. Atlantic City v. Atlantic City Expo., 62 N.J. 322, 330, 301 A.2d 441 (1973); see also State v. S. Nalbone Trucking Co., 128 N.J. Super. 370, 377, 320 A.2d 186 (App.Div. 1974); New Jersey Sports and Exposition Authority v. Giant Realty Assocs., 143 N.J. Super. 338, 351, 362 A.2d 1312 (Law Div. 1976); see also Yara Engineering Corp. v. Newark, 136 N.J. Eq. 453, 465, 42 A.2d 632 (Ch. 1945); 27 Am.Jur.2d, Eminent Domain, § 283 at 79; 30 C.J.S. Eminent Domain, § 446 at 604-605; Model Eminent Domain Code, § 1005, 13 Uniform Laws Annotated 91 (1986) (the fair market value of property taken does not include an increase or decrease in value before the date of evaluation that is caused by the proposed improvement or project for which the property is taken).[7]
With reference to the enhanced value, the trial court in its discretion, County of Ocean v. Landolfo, 132 N.J. Super. 523, 528, 334 A.2d 360 (App.Div. 1975), may reject comparable sales which are tainted by an enhanced value because of potential confusion, conjecture or speculation. But if the trial court determines that the tainted comparable sale may be admitted, appropriate cautionary instructions should be given, not only in its general instructions, but also during the trial at the time of admission of the testimony along with an explanation that "tainted" comparable sales must be discounted by whatever amount they reflect value attributable to the project after the date of the government commitment. United States v. 320.0 Acres of Land, 605 F.2d 762, 802, 803 n. 80 (5 Cir.1979). See also a trilogy of cases decided by the California Supreme Court: Merced Irrigation Dist. v. Woolstenhulme, 4 Cal.3d 478, 93 Cal. Rptr. 833, 483 P.2d 1 (1971); People ex rel. Dept. of *545 Public Works v. Reardon, 4 Cal.3d 507, 93 Cal. Rptr. 852, 483 P.2d 20 (1971); County of San Luis Obispo v. Bailey, 4 Cal.3d 518, 93 Cal. Rptr. 859, 483 P.2d 27 (1971). As noted in City of Los Angeles v. Retlaw Enterprises, Inc., 16 Cal.3d 473, 481, 128 Cal. Rptr. 436, 441, 546 P.2d 1380, 1385 (1976):
Collectively, they hold that the trial court stood empowered to admit such sales in evidence if it found them sufficiently comparable to the condemned property to shed light upon its value, cautioned the jury to disregard those sales to the extent that they reflected noncompensable project enhancement, and permitted the opposing party to cross-examine the party introducing such sales on the extent of comparability. [See United States v. 320.0 Acres of Land, 605 F.2d at 802-803.]
The tainted element of noncompensable enhancement was compounded by the added factor of inflated prices prevailing during a boom caused by a reduction in interest rates on mortgages. There can be no doubt that financing terms affect value, American Institute of Real Estate Appraisers, The Appraisal of Real Estate at 17 (9th ed. 1987), which in turn affects sales prices of real estate. Id. at 341. The prevailing view seems to be that property taken in eminent domain must be valued for purposes of compensation at its market value as of the time of taking, and that no effect should be accorded changes in the purchasing power of money. 27 Am.Jur.2d, supra, § 274 at 63. See State v. Gorga, 54 N.J. Super. 520, 527, 149 A.2d 266 (App.Div. 1959) ("Whether inflated or depressed, the value is of a certain date." Id. at 528, 149 A.2d 266).
As a general rule, just compensation in condemnation cases is measured as of the date of the public taking. Kugler, 58 N.J. 374, 377-378, 277 A.2d 873, citing State v. Jones, 27 N.J. 257, 142 A.2d 232 (1958); Gorga, 26 N.J. 113, 138 A.2d 833 (1958); see N.J.S.A. 20:3-30(b). The defendant notes that its appraiser "established a date of taking evaluation of the subject property by making certain adjustments to the sales prices, including an adjustment for time by reducing the prices some 20% per year *546 back to September 1984." See N.J. Turnpike Auth. v. Herrontown Woods, 145 N.J. Super. 279, 283-285, 367 A.2d 893 (App. Div. 1976) (comparable sales which were enhanced in value by the Turnpike project for which the subject property was being taken were admissible in evidence with enhanced value "factored out." Id. at 283, 367 A.2d 893). Nevertheless, opinion as to damage resulting from taking which includes both compensable and noncompensable items and does not separate, nor permit the fact finder to separate, proper from improper is no competent evidence. State, by Comm'r of Transportation v. Faps Realty Corp., 197 N.J. Super. 44, 48-49, 484 A.2d 35 (App.Div. 1984).
Nevertheless, to control speculation and abuse, post-taking sales should be used only under the most restricted conditions. The benefit of the comparison is lost if time has altered the factors which result in a determination of value, Glen Wall Associates v. Township of Wall, 99 N.J. 265, 283, 491 A.2d 1247 (1985), particularly where, as here, the value of the condemned property is enhanced by the improvement.
Although the trial court instructed the jury that the date of taking was October 18, 1984, there was no instruction given to the jury concerning the project enhancement factor or instructions concerning inflation. Further, no instruction was given to the jury concerning the elements to be excluded from or included in the compensation award, nor was it cautioned to disregard that portion of comparable sales to the extent that it reflected noncompensable project enhancement, or to reject any evaluation which included inflationary boom sales prices. Although defendant's expert extrapolated or "factored out" his opinion of inflation at 20% (and the jury obviously rejected his evaluation), the jury should nevertheless have been instructed on the noncompensable elements of the opinion. Moreover, there is no indication concerning the basis for the 20% factor, *547 nor is there any distinction made between inflation and noncompensable project enhancement.
In view of the foregoing, we are satisfied that there was trial error in failing to take into account any portion of an increase in sales price of comparable sales due to project enhancement or between the element of project enhancement and inflationary sales price due to the boom real estate market. There can be no doubt that the trial judge is given wide discretion in determining the admissibility of evidence bearing upon the value of property, East Orange v. Crawford, 78 N.J. Super. 239, 242, 188 A.2d 219 (Law Div. 1963), but in view of the conjectural and speculative nature of the percentage of inflation and noncompensable project enhancement, we are satisfied that the testimony of defendant's expert does not support the award based upon it. Faps Realty Corp, 197 N.J. Super. at 48-49, 484 A.2d 35.

IV
The jury awarded $14,475 for remainder damages to the southwest portion of the property owned by Phillipsburg. The State contends that the damages attributed to this portion are non-compensable as a matter of law and should be stricken from the verdict. The State points out that "[a property owner is not] entitled to compensation because of inconveniences caused by the need to follow a more circuitous route to his property. State v. Charles Investment Corporation, 143 N.J. Super. 541, 544 [363 A.2d 944] (Law Div. 1976), aff'd o.b. 151 N.J. Super. 14 [376 A.2d 534] (App.Div. 1977), aff'd o.b. 76 N.J. 86 [385 A.2d 1227] (1978)[;] ... State v. Stulman, 136 N.J. Super. 148, 155-56 [345 A.2d 329] (App.Div. 1975)[.]"
The problem we have with the State's position is that the cases cited relate to a change in the highway system or traffic patterns or ease in traveling to or from any place in or on the *548 highway system. As pointed out by defendant, the construction of I-78 cut off one remainder of the property from the other remainder. If the re-routing were related solely to the traffic pattern, we would agree with the State. However, this involved not only a difference in traffic pattern but also the installation of utilities which could not cross I-78, except by an expensive method of tunneling. This splitting adversely affected a potential developer's ability to develop the land by way of increased expenses in bringing utilities to the southwest section.
We find no merit to the State's contention that damages to the southwest remainder are non-compensable as a matter of law.
In view of our determination that the trial court erred in submitting to the jury the valuation of the property located in Phillipsburg on the basis of a lot subdivision, and further in view of our determination that there was trial error in failing to take into account or charge the jury on enhanced project valuation and inflation, there is no need to consider the State's final issue that the verdict was against the weight of the evidence.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] The State also presented testimony by Harry A. Bonitz, a principal engineer with the New Jersey Department of Transportation, who described the taking and explained the Route 78 construction.
[2] Since the average value of the lots was approximately $19,000 and the estimate for improvements was $11,000 to $13,000, the net value per lot was incorrectly calculated. If the improvements cost $11,000, the net value of the lot would, at most, be $8,000; if the cost of the improvements is evaluated at $13,000, the net value of the lots would have been $6,000. Therefore, the evaluation by the jury of nine lots at $8,500 per lot for a total of $76,500 is mathematically incorrect.
[3] Notwithstanding the court's ruling, the State's objections throughout trial to evaluation of the property by lot were overruled.
[4] At trial, a "plan of Riverview Estates" dated May 6, 1955, which indicated separate lots was offered into evidence. The subdivision map was formerly adopted by Phillipsburg in May 1955. Another map was offered into evidence showing a plan of property acquired from Riverview Estates, Inc. and the lots were added to the Phillipsburg tax maps in 1957. Another map dated April 10, 1956 was offered into evidence entitled "Plan Showing Proposed Town and Subdivision Line between the Town of Phillipsburg and Pohatcong Township."
[5] N.J.S.A. 40:55D-35 provides, among other things, "[b]efore any [building] permit shall be issued, such street shall have been certified to be suitably improved to the satisfaction of the governing body, or such suitable improvement shall have been assured by means of a performance guarantee, in accordance with standards and specifications for road improvements approved by the governing body, as adequate in respect to the public health, safety and general welfare of the special circumstance of the particular street.
[6] In 36 New Jersey Practice (Frizell & Pozycki, "Land Use Law"), Appendix 7, Schedule A, suggests a check list for required submissions to a planning or zoning board of adjustment. Schedule A, general requirements for all applications, lists some 19 items. Id. at 647-649. The preliminary major subdivision application itemizes for given type plans required with eight subdivisions. Id. at 650. For final major subdivisions, three separate requirements are listed with eight subdivisions and requirements, id. at 651, and requirements for a site plan application again lists some five items required with 15 subdivisions. Finally, the subdivision, after final approval, must be recorded in the County recording office. N.J.S.A. 40:55D-54.
[7] The condemnation-induced changes in value, whether upwards or downwards, are excluded from consideration so that neither party will be adversely affected by market abnormalities caused by the prospect of the condemnation action. Comment, § 1005, Model Eminent Domain Code, supra at 92.