[L.A. No. 29794. In Bank. Mar. 31, 1971.]

COUNTY OF SAN LUIS OBISPO, Plaintiff and Appellant, v.
WESLEY BAILEY et al., Defendants and Respondents.

**520**

## COUNSEL

James W. Powell and Robert N. Tait, District Attorneys, Norman Sherr and Robert J. Schum, Deputy District Attorneys, and Thomas M. Dankert for Plaintiff and Appellant.

Harry S. Fenton, Joseph A. Montoya, Charles E. Spencer, Jr., William H. Stoffers, County Counsel (Monterey), George P. Kading, County Counsel (Santa Barbara), Robert D. Curiel, Assistant County Counsel, Edwin M. Osborne, Acting County Counsel (Ventura), Ralph B. Jordan, County Counsel (Kern), John M. Stanton, Deputy County Counsel, Thomas C. Lynch, Attorney General, W. A. Shank, Assistant Attorney General, and J. M. Sanderson, Deputy Attorney General, as Amici Curiae on behalf of Plaintiff and Appellant.

Ogle & Gallo, Charles E. Ogle, Gerald Mason and James B. Merzon for Defendants and Respondents.

## OPINION

**TOBRINER, J.**—In this eminent domain proceeding plaintiff County of San Luis Obispo condemned 160.475 acres of unimproved property owned by defendants, for use in connection with the Lopez Dam project. The jury awarded defendants $300 an acre (a total of $48,142.50) as just compensation and the county appeals from that judgment.

The county raises three principal contentions on this appeal. First, it contends that the trial court erred in admitting into evidence a sale of property which had been enhanced in value by the dam project. Second, the county claims that the court erred in receiving evidence of sales of property located 30 to 50 miles from the condemned property. Third, plaintiff maintains that the court committed prejudicial error in delaying a ruling with reference to the existence of an easement to the condemned property. We

have concluded that none of these contentions are meritorious and that the judgment should be affirmed.

### 1. *The Facts*

The Bailey property, the subject of this condemnation action, is located near the Arroyo Grande Creek in the coastal mountain range, at the southern boundary of the proposed Lopez Dam project. The property is "L" shaped, with the vertical bar of the "L" running in a north-south direction. Much of the property is "quite mountainous," but the southern portion of the tract (the base of the "L") includes a small valley with a spring which has water "year round"; a portion of the property extends across the Arroyo Grande Valley to the Arroyo Grande Creek, which also runs the entire year. The main access to the property is from the Arroyo Grande Creek Road which intersects the northern portion of the property; at trial the landowners contended that they also had a prescriptive easement of access to the southern portion of their property across the adjacent land to the east, but the county disputed this fact and the court eventually ruled that no such easement existed.

Plans for the Lopez Dam project were well under way by the early 1960's. In 1962 a preliminary appraisal of land for the project was undertaken and in August 1964 the county applied for financial assistance for the water project from the state (Wat. Code, § 12880 et seq.). As a condition for the receipt of the requested state funds, the county agreed to make the reservoir available as a lake for boating, camping and other recreational purposes and to provide recreational facilities. A bond issue for the project was approved by the county voters on September 28, 1965, and during the several months prior to that election public knowledge of the project, and its recreational potential, became widespread. The parties apparently agree that the condemned property was expected to be taken for this project from as early as the 1962 land appraisal. The present action was not commenced until February 27, 1967.

At trial Dr. Vrooman, a real estate appraiser called by defendants, testified that in his opinion the highest and best use of the property, before the dam project, was for recreational purposes, and he stated that, given this use, the Bailey property had a value of $450 an acre on February 27, 1967, the valuation date. Vrooman explained that recreation land in the region was very limited since most property was either held in government forest preserves or tied up in the "large holdings" of cattle ranches. The appraiser indicated that the Bailey property was particularly suited for such use because it contained one of the few "year round running" creeks in the county, had a highly desirable climate and was favored by

the striking scenic beauty of the narrow mountain range in which the land was located. The appraiser further stated that an extensive study of the trend of recent sales of recreational property in the county revealed a rapidly rising market for recreation lands.

In support of his valuation opinion, Vrooman offered the specifics of the sales of seven properties which in his opinion were "comparable" to the Bailey property.[1] Four of these properties were located in the Old Creek region, some 30 to 50 miles distant from the Bailey tract. Vrooman explained that he had searched for sales in the same mountain range in which the Bailey property was located and for land which had topography, access to creeks, access to roads and other features similar to the Bailey property, and that the Old Creek region was quite similar to the Bailey land in these respects. The four Old Creek sales had all occurred during 1964 and 1965, the acreage sold varied from 40 acres to 158 acres, and the sales prices ranged from $200 an acre to $300 an acre.

The three remaining comparable properties were located in the area of the Lopez Dam project. The county urged no objection to the introduction of two of these sales, and indeed, it presented evidence of those sales in support of its valuation figure as well. These sales each involved 40 acres of land, one at $200 an acre, the other at $287 an acre. The county objected strenuously, however, to the introduction of the third sale. It argued that this sale, the "Cossa" sale, reflected substantial project enhanced value, was not "comparable" to the Bailey land and should therefore be excluded. The "Cossa" transaction, completed in late 1965, involved a sale of 40 acres of land for $700 an acre.

The evidence reveals a considerable conflict of opinion concerning the factors which influenced the participants in the "Cossa" sale. Early in 1965 a Robert Otis purchased 400 acres of the Wood Ranch, a ranch which adjoined the Bailey property and which was partly within the proposed dam project. Otis subdivided the 400 acres and in late 1965 sold 40 acres to the Cossa purchasers. In support of its contention that the Cossa sale reflected substantial project enhancement, the county presented evidence which revealed that a Mr. Lovett, a real estate broker who sold the 400 acres of the Wood Ranch to Otis, had obtained a map showing the location of the dam project in relation to the Wood Ranch and had exhibited the map to prospective purchasers. Another witness called by plaintiff testi-

---

[1]Prior to the empaneling of the jury for the valuation phase of this case, the court conducted a hearing on several legal questions, including the admissibility of comparable sales. The county's numerous objections to several of the defendants' appraisers' "comparable sales" were raised at this hearing, and the evidence offered by the county in support of its objections was initially presented at this stage.

fied that Tony Cossa had told him that the property had been purchased for "lake frontage."

Vrooman testified for the defendants, however, that in connection with his preparation for trial he had spoken with members of the Cossa family and that they had stated that when they purchased the 40 acres they were not relying on either the passage of the upcoming bond proposal[2] or the completion of the dam project. Indeed, the defense appraiser testified that members of the Cossa group had stated that they "made their purchase on the basis of acquiring recreational land and couldn't care one way or the other whether a bond issue passed or whether or not a dam was to be built." No member of the Cossa group of purchasers was called as a witness by either party.

Although the trial court recognized this direct conflict in the evidence, it did not explicitly resolve the issue of whether the sale was "project enhanced" or not. Instead the court allowed the sale to be introduced into evidence, permitted the county liberal cross-examination on the circumstances of the sale, and finally instructed the jury that if they found that the sale price had been affected by knowledge of the Lopez Dam project, the sale should be disregarded.[3] The county's principal contention on this appeal is that the trial court erred in this treatment of the "Cossa sale," and it is to that claim which we initially turn.

    *2. Having found that the Cossa sale "could fairly be considered as shedding light" on the value of the Bailey property, the court did not err in admitting evidence of the sale, even though it may have reflected "project enhanced" value, since the jury was instructed to disregard the sale to the extent it reflected such "project enhanced" value.*

■ The Bailey property, the subject of the instant condemnation action, was known to be included within the Lopez Dam project from the project's inception, and thus, under the analysis set forth in *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) *ante*, p. 478 [93 Cal.Rptr. 833,

---

[2]The bond election was held on September 28, 1965, about 20 days after the Cossa purchase had been made.

[3]The court gave the following instruction at plaintiff's request: "If the sale's price of property used as a comparable sale in this case is in your judgment higher because it has been affected by the knowledge of the buyer and seller of the Lopez Dam Project such sale should be disregarded by you.

"If any witness has used such a sale in arriving at his opinion of fair market value, this fact should be considered by you in evaluating his opinion of fair market value." The court further instructed: "The property being taken may not be valued with reference to enhancement or depreciation in value, if any, to said property arising solely and directly from the public improvement proposed by the plaintiff. Increase or decrease in value, if any, caused by the construction or knowledge of the Lopez Dam project is excluded in the determination of fair market value."

483 P.2d 1] the county correctly maintains that the landowner was not entitled to compensation for "project enhanced" value. We cannot, however, accept the county's claim that the trial court, in admitting the "Cossa sale" into evidence without first determining that it was not "project enhanced," committed prejudicial error.

■ We recognize, of course, that under section 816 of the Evidence Code, the trial judge bears the initial responsibility of determining a sale's "comparability" before he may properly admit the sale into evidence. "It is the universal rule—and the very nature of the subject matter demands it—that questions of comparability of market data are initially decided by the court as a matter of law. . . ." (Cal. Law Revision Com., Recommendations Relating to Evidence in Eminent Domain Proceedings (1960) pp. A-50–A-51; see *Los Angeles etc. School Dist.* v. *Swensen* (1964) 226 Cal.App.2d 574, 583 [38 Cal.Rptr. 214].) ■ In making this initial determination, however, the trial judge cannot base his judgment simply on whether or not a given sale is "project enhanced," as plaintiff suggests; rather, as the language of section 816 explicitly directs, the judge's decision is to be guided by whether the proffered sale "may be fairly considered as shedding light on the value of the [condemned] property. . . ."

Of course, in evaluating a particular sale under this vague "shedding light" standard, a court will naturally take into account any improper enhancement that may be reflected in the proffered sale and, in many cases, may properly conclude that such sale will not "shed light" on the land to be valued, but instead will confuse the jury by introducing an extraneous element of value. As we have noted in *Woolstenhulme* (*ante,* at pp. 500-501), however, in other cases there may be competing considerations which convince the court that a sale will "shed light" on the value of the condemned land notwithstanding the fact that it reflects project enhancement, and thus we have declined to adopt an iron-clad rule of exclusion for all project enhanced sales.

■ In a case such as the instant one, in which the value of the property should not be augmented by project enhancement, because the property is known to be included in the project from the outset, the court can prevent any confusion by instructing the jury to disregard the sale to the extent that it reflects project enhanced value.[4] Under section 816, the ultimate standard for admissibility remains whether the "price realized for the

---

[4]The instructions given in the instant case were even more favorable to the plaintiff than required, since they directed the jurors to disregard the Cossa sale *completely* if they found that it reflected any project enhancement. (See fn. 3, *supra.*)

property sold may fairly be considered as shedding light on the value of the property to be valued." The trial court did not err in admitting the Cossa sale without first determining that it was not project enhanced.

The county contends, additionally, that the trial judge failed to make *any* preliminary determination with respect to the comparability of the Cossa sale. The record, however, is to the contrary. At the conclusion of the prevaluation stage hearing, at which both parties presented evidence relating to comparable sales which they wished to introduce into evidence, the court declared: "I think that each side has chosen adequate and sufficient comparable sales. And although they may not be entirely comparable I think that they are admissible under the law of this state. [Par.] . . . I think there's seven comparable sales on the part of the plaintiff, and I believe there's seven comparable sales on the part of the defendants. *The Court is ruling that in its estimation they're all sufficiently comparable to throw some light on the situation we have here.*" (Italics added.) We cannot conceive how the court could have more clearly demonstrated that it was making a decision on "comparability."

Having found the Cossa sale sufficiently comparable to warrant admission in evidence, the court was certainly justified in permitting the jury, properly instructed, to hear and to evaluate all the conflicting evidence on "project enhancement." ■ The trial judge's prima facie determination that a sale is sufficiently "comparable" to be admitted into evidence has never been thought to foreclose the question of "comparability" altogether. "[I]f at the discretion of the court, such [sales] are admissible on the grounds of comparability, the degree of comparability is a question of fact for the jury." (Cal. Law Revision Com., Recommendations Relating to Evidence in Eminent Domain Proceedings (1960), p. A-51; cf. *Regents of University of California* v. *Morris* (1968) 266 Cal.App.2d 616, 642-643 [72 Cal.Rptr. 406].)

In the instant case the court went out of its way to ensure that the county had full opportunity to challenge the "comparability" of the Cossa sale before the jury. After concluding that the sale would be admitted, the court commented: "I'm stating this further so that no one will be misled. I'm going to grant very liberal analysis to the People to go into a lot of the matters on the Cossa sale that have been objected to here at this time so that the jury may draw the inferences that naturally come from that evidence."

We find no error in the procedures utilized by the trial judge in connection with the Cossa sale.

3. *The trial judge did not abuse his discretion in admitting sales of property located 30 to 50 miles from the condemned land as "comparable sales."*

We also reject the condemner's contention that the trial court erred in admitting into evidence sales of property located in the Old Creek area, 30 to 50 miles from the Bailey land. The county apparently claims that all four of these sales were "noncomparable" as a matter of law, because the lands involved in these sales were "too remote" from the property which was the subject of the eminent domain proceeding. The 30 to 50 miles distance alone, it is suggested, required the exclusion of this evidence.

Section 816 provides that "[i]n order to be considered comparable . . . the property sold must be located sufficiently near the property being valued . . . to make it clear that the property sold and the property being valued are comparable in value and that the price realized for the property sold may be fairly considered as shedding light on the value of the property being valued." ■ Past cases have suggested that trial courts retain considerable discretion in determining whether a sale is "sufficiently near" to shed light on the value of the property being taken (e.g., *San Bernardino County Flood Control Dist.* v. *Sweet* (1967) 255 Cal.App.2d 889, 905 [63 Cal.Rptr. 640]; cf. *Los Angeles etc. School District* v. *Swensen, supra,* 226 Cal.App.2d 574, 583 [38 Cal.Rptr. 214]); indeed, the language of the section ("sufficiently near") obviously contemplates the exercise of such discretion.

In the instant case defendants' appraisal witness explained that because of the rather distinctive terrain of the Bailey property there were few sales of "comparable property" within the immediate vicinity. He testified that he searched for sales of properties which were similar to the condemned property in "size, character, topography, suitability for recreational use, access to creeks and access to roads," and, on that basis, chose the Old Creek sales which plaintiff now claims are too distant to be "comparable." ■ Given the great variety of factors of "comparability" to be considered, and the relative scarcity of similar property in the immediate vicinity, we cannot find that the trial judge abused his discretion in admitting the challenged sales under section 816.

4. *The trial judge's delay in ruling on the question of the existence of a prescriptive easement did not prejudice the county.*

Lastly, the condemner claims that the trial court improperly delayed ruling on the question of whether defendants had acquired a prescriptive easement of access to the southern portion of the condemned property, and

that this delay prejudiced the county. As noted earlier, much of the Bailey property was "quite mountainous," and the value of a remote region in the southern portion of the property depended, to a significant degree, on whether the landowners had obtained a prescriptive easement of access to the region over neighboring property. Defendants claimed they had such an easement; the condemner disputed that claim.

During the preliminary proceedings, preceding the empaneling of the jury for the valuation stage, the county requested the trial judge to rule on this issue before any evidence of the value of the property was submitted to the jury. The judge declined to rule on the matter at that stage. After the jury was empaneled, the county renewed the request that the judge hear evidence on the issue outside the presence of the jury. Rather than delay the trial, the court stated that it would rule on the issue "some place along the line" before instructing the jury.

At trial, defendants presented evidence with reference to the easement, and plaintiff's appraisal witnesses gave two estimates of the value of this remote portion of the property: one value with the easement, and one without. Before instructing the jury, the judge heard argument on this matter and concluded that the landowner had not acquired the prescriptive easement. The court thereafter instructed the jury that: "It has been contended by the defendant property owners in this case that they have a prescriptive easement to the southerly portion of their property across that property immediately next to, and easterly of, their property. This property has been . . . referred to as the Wood Ranch. The Bailey property has no such legal right of access over the Wood Ranch. The only legal access to the southerly part of the Bailey property is from the northerly part of the property from the same property at the north end."

The condemner now contends that the delay in the trial court's ruling on the issue permitted the landowners to present a substantial amount of irrelevant evidence relating to the easement, and tended to confuse the jury on the extent of access to the southern portion of the property. ■ We have long recognized, of course, that "[t]he order of proof rests largely within the discretion of the trial court" (*People* v. *Pike* (1962) 58 Cal.2d 70, 93 [22 Cal.Rptr. 664, 372 P.2d 656]; *Dressel* v. *Parr Cement Co.* (1947) 80 Cal.App.2d 536, 541 [181 P.2d 962]; *People* v. *Warner* (1969) 270 Cal.App.2d 900, 906 [76 Cal.Rptr. 160]; see Evid. Code, § 320), and the procedure followed by the judge in this matter appears to fall well within permissible latitudes. Moreover, although the county claims that the delay confused the jury, the court did give a proper instruction on this matter and the condemner does not suggest any plausible explanation as to why this instruction could not be followed. ■ We thus conclude

that the court's "delay" in ruling, if any, does not constitute prejudicial error.

In sum, we conclude that none of the county's three contentions are meritorious. The judgment is affirmed.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.