[L.A. No. 30492. In Bank. Mar. 9, 1976.]

CITY OF LOS ANGELES, Plaintiff and Appellant, v.
RETLAW ENTERPRISES, INC., Defendant and Respondent.

476

---

## COUNSEL

Burt Pines, City Attorney, Milton N. Sherman, Chief Assistant City Attorney, James H. Pearson, Assistant City Attorney, and Ronald J. Einboden, Deputy City Attorney, for Plaintiff and Appellant.

Harry S. Fenton, Joseph A. Montoya, Robert L. Meyer, Hugh R. Williams and Robert W. Vidor as Amici Curiae on behalf of Plaintiff and Appellant.

John N. McLaurin, William M. Bitting and Hill, Farrer & Burrill for Defendant and Respondent.

O'Neill & Huxtable, Redwine & Sherill, Justin M. McCarthy, Robert S. Webber, Rinehart & Schwartz, Asaro & Keagy, Roscoe D. Keagy, Cox, Cummins & Lamphere, James D. Cox, Desmond, Miller & Desmond, Richard F. Desmond, Thorpe, Sullivan, Workman, Thorpe & O'Sullivan, Thomas G. Baggot, Burke, Williams & Sorenson, Royal M. Sorenson, Rogers, Vizzard & Tallett, John D. Rogers and Thomas M. Dankert as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**TOBRINER, J.**—In this eminent domain proceeding, plaintiff City of Los Angeles (city) condemned approximately 773 acres of unimproved property belonging to defendant Retlaw Enterprises, Inc. (Retlaw) in connection with plans to expand Los Angeles International Airport. The jury awarded Retlaw $14,350,000, and the city appeals from that judgment.

The city objects to several of the trial court's rulings regarding the admissibility of evidence, contends that the trial court incorrectly instructed the jury, and submits that the jury awarded excessive damages. We have concluded that these contentions lack merit and that the judgment of the trial court should be affirmed.

Retlaw's property, the subject of this condemnation proceeding, is located in the Palmdale area of the Antelope Valley. Retlaw had opened an escrow on April 18, 1968, which had closed on May 13, 1968, resulting in Retlaw's immediate acquisition of 165 acres of the subject property with an option to purchase the remaining 608 acres. Retlaw subsequently exercised that option through an escrow closing on July 25, 1968. The total purchase price for the 773 acres was $8,781,000.

After the city instituted this condemnation action, the trial court, in accord with our recommendation in *Merced Irrigation Dist.* v. *Woolsten-*

*hulme* (1971) 4 Cal.3d 478 [93 Cal.Rptr. 833, 483 P.2d 1], conducted a preliminary inquiry in order to determine the date at which it became reasonably probable that the subject property would be included in the public project for which it was eventually condemned. The court concluded that the date of probable inclusion was November 10, 1967. Neither party disputes that finding. Nor does either party deny that the date at which the property is to be valued is January 7, 1974. (Code Civ. Proc., § 1249.)

At trial, the expert appraisers called by the two parties gave widely disparate opinions of the fair market value of the property valued at its highest and best use. Cox and Metcalfe, Retlaw's appraisers, both valued the land at about $21 million; the two experts called by the city appraised the land at about $4 million. The city objected, to no avail, to the introduction of certain evidence upon which Retlaw's experts based their valuations.

Specifically, the city objected to the testimony as to the price for which Retlaw purchased the property in May 1968—several months subsequent to the property's probable inclusion in the project. As we have noted, Retlaw had purchased the property for $8,781,000; the trial court admitted the sales price into evidence, cautioning the jury to disregard any part of that price which the jury concluded was attributable to project enhancement. The city objected to the testimony regarding the trend in sales prices of admittedly noncomparable property in the Palmdale area. The city also objected to Metcalfe's testimony as to the possibility that the user of the property might eventually obtain access to the runways at the nearby airport and to his purported consideration of Retlaw's specific plans to develop the property. The city further complains that the trial court improperly prohibited the testimony of Stoneman, a purchaser of property in the area who allegedly would have undermined Cox's testimony about the market's knowledge of the scope of the project at the time Retlaw purchased the property in 1968.

The city submits that the instructions to the jury were misleading to its detriment in that they improperly emphasized the fact that Retlaw was not required to show an active market demand for the subject property. It complains that the trial court crafted an instruction that was, on its face, unduly favorable to Retlaw and then unjustifiably refused to give the jury an instruction tendered by the city which would have rectified the problem.

. Finally, the city contends that the damages awarded by the jury were excessive, notwithstanding the fact that they fell well within the valuation limits testified to by the four appraisers. For the reasons indicated below, we do not find the city's arguments convincing, and we affirm the judgment of the trial court.

1. ▮▮▮ *The trial court did not err in admitting the 1968 sales price of the subject property, notwithstanding the fact that it may have reflected some noncompensable "project enhanced value"; the trial court instructed the jury to disregard the sales price to the extent that it reflected such noncompensable value.*

We consider first the city's contention that the trial court incorrectly admitted evidence of the price at which Retlaw purchased the subject property in May 1968, some six months after the property's probable inclusion in the project. Incorrectly reading our opinion in *Merced Irrigation Dist.* v. *Woolstenhulme, supra,* 4 Cal.3d 478, the city argues that the 1968 sales price was inadmissible because it reflected "project enhanced value." Rather than mandating the exclusion of the 1968 purchase price of the property, *Merced* and its companion decisions support the trial court's admission of the evidence.

Section 815 of the ·Evidence Code sets forth the guidelines for admitting testimony as to sales of the subject property in the determination of the value of such property in a condemnation action. It provides: "When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the price and other terms and circumstances of any sale or contract to sell and purchase which included the property or property interest being valued or any part thereof if the sale or contract was freely made in good faith within a reasonable time before or after the date of valuation, except that where the sale or contract to sell and purchase includes only the property or property interest being taken or a part thereof such sale or contract to sell and purchase may not be taken into account if it occurs after the filing of the lis pendens."

Despite the language of the foregoing provision, the city argues that evidence of the 1968 sales price of the subject property should not have been admitted under section 815 because that price reflected an element of "project enhanced value" for which the property owner was entitled to no compensation.

In three decisions handed down in 1971, this court analyzed the problem of "project enhanced value" at some length. (*Merced Irrigation Dist.* v. *Woolstenhulme, supra*, 4 Cal.3d 478; *People* ex rel. *Dept. of Pub. Wks.* v. *Reardon* (1971) 4 Cal.3d 507 [93 Cal.Rptr. 852, 483 P.2d 20]; *County of San Luis Obispo* v. *Bailey* (1971) 4 Cal.3d 518 [93 Cal.Rptr. 859, 483 P.2d 27].) Recognizing that "widespread knowledge of a proposed public improvement, planned for an indefinite location within a given region or neighborhood, will frequently cause the market value of land in the region or neighborhood to rise," (*Merced Irrigation Dist.* v. *Woolstenhulme, supra*, 4 Cal.3d at p. 488), we delineated the extent to which and the conditions under which such project enhanced value constitutes a proper component of just compensation under article I, section 14 of the California Constitution.

We held that although some forms of project enhanced value constitute compensable elements of value in an eminent domain proceeding, increases in the value of property "known to be within the project . . . [and] expected to be condemned" are *not* part of the just compensation due its owner. (*Merced Irrigation Dist.* v. *Woolstenhulme, supra*, 4 Cal.3d at p. 490.) To facilitate the exclusion of such impermissible elements of project enhancement, we approved the trial court's holding of a hearing to establish the date of the property's "probable inclusion" in the project (*Merced Irrigation Dist.* v. *Woolstenhulme, supra*, 4 Cal.3d at p. 498, fn. 12); any project enhancement that accrued to the property subsequent to that date was not compensable.

In the instant case, the trial court held a hearing and ruled that the subject property's date of probable inclusion in the project was November 10, 1967—about six months before the sale whose admissibility lies at issue. Thus, insofar as this sales price reflects "project enhanced value" that had accrued within the prior six months, it contains an element of value for which Retlaw can claim no compensation.

The city, however, confounds this substantive rule of compensation with the question of the *admissibility* of the sale price. The city argues that in spite of the express Evidence Code provision indicating that the sales price of condemned property is admissible whether sold "before or after the date of valuation"[1] (Evid. Code, § 815), the evidence in question was inadmissible because it was tainted by noncompensable project enhancement.

---

[1]The date of valuation in the instant case was January 7, 1974, the date trial commenced. (Code Civ. Proc., § 1249.)

Our holding and reasoning in the *Merced* trilogy foreclose the city's argument. Those cases involved the propriety of admitting in evidence the sales prices of properties comparable to the condemned property when those prices were bloated by project enhanced value for which the owner of the condemned property could claim no compensation. Collectively, they hold that the trial court stood empowered to admit such sales in evidence if it found them sufficiently comparable to the condemned property to shed light upon its value, cautioned the jury to disregard those sales to the extent that they reflected noncompensable project enhancement, and permitted the opposing party to cross-examine the party introducing such sales on the extent of comparability.

Section 816 of the Evidence Code, as companion legislation to section 815 which deals with the subject property, permits a court to submit in evidence the sales of other properties sufficiently comparable to the condemned property to shed light upon its value.[2] In *Merced,* the trial court had permitted testimony concerning the sales prices of the neighboring properties that admittedly reflected project enhanced value for which the condemnee could claim no compensation. We squarely rejected the notion that the taint of noncompensable project enhanced value rendered these other sales inadmissible per se: "sales are not necessarily 'non-comparable' simply because they reflect 'substantial' project enhancement, and thus a trial court . . . may properly admit such sales in evidence." (4 Cal.3d at p. 487.) Since the trial court had cautioned the jury to disregard these sales to the extent that they reflected noncompensable project enhanced value, we held their admission a sound exercise of the trial court's discretion.

The disposition of this argument in *Merced* comported with the general principles that govern comparable sales under section 816. We recognized in *Merced* that the taint of project enhancement might render the value of a neighboring property a less than perfect indicator of the worth of the condemned property. We refused, however, to treat this

---

[2]"When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the price and other terms and circumstances of any sale or contract to sell and purchase comparable property if the sale or contract was freely made in good faith within a reasonable time before or after the date of valuation. In order to be considered comparable, the sale or contract must have been made sufficiently near in time to the date of valuation, and the property sold must be located sufficiently near the property being valued, and must be sufficiently alike in respect to character, size, situation, usability, and improvements, to make it clear that the property sold and the property being valued are comparable in value and that the price realized for the property sold may fairly be considered as shedding light on the value of the property being valued."

particular dissimilarity between the subject property and the purportedly comparable property differently than variations in size, shape, location, date of valuation, and the myriad other determinants of value.

We have never declared properties noncomparable per se merely because they differ in size or shape. On the contrary, the trial court's obligation, pursuant to section 816, is to determine whether the sale price of one property could *shed light* upon the value of the condemned property, notwithstanding any differences that might exist between them. If it resolves that question affirmatively, it can admit the evidence. The jury then, on the basis of all the evidence, determines the extent to which any differences between the condemned property and the comparable property affect their relative values. In *Merced,* consequently, we simply refused to carve a special exception that provided that when the difference pertained to project enhanced value, the sales were not comparable as a matter of law.

In *County of San Luis Obispo* v. *Bailey, supra,* 4 Cal.3d 518, we followed the reasoning of *Merced.* The condemnor had objected to the trial court's ruling that a certain sale was comparable without first determining that the sale price reflected no project enhanced value. We rejected the condemnor's argument in language that emphatically disavowed a rule of per se exclusion: "there may be competing considerations which convince the court that a sale will 'shed light' on the value of the condemned land notwithstanding the fact that it reflects project enhancement, and thus *we have declined to adopt an iron-clad rule of exclusion for all project enhanced sales.*" (4 Cal.3d at p. 524.) (Italics added.)

In *People* ex rel. *Dept. of Pub. Wks.* v. *Reardon, supra,* 4 Cal.3d 507, we indicated that the trial court erred in refusing to permit the state's counsel to cross-examine an appraiser concerning the inclusion of possible project enhancement in the prices of comparable properties about which he had testified. In so ruling, we assumed that the prices of comparable properties were admissible even though they reflected noncompensable project enhancement; the *only* error lay in denying the state sufficient opportunity in cross-examination to isolate the impermissible elements, and even that error we held to be harmless.

Our prior decisions, then, leave no doubt that a project enhanced sale of property other than the subject property is not inadmissible per se; its admissability is committed to the discretion of the trial court. No different rule is required merely because the proffered project

enhanced sale is a sale of the subject property itself. The test for the admissibility of sales of the subject property under section 815 is substantially identical to that for the admissibility of comparable properties under section 816:[3] sales are admissible when they illuminate the value of the subject property at the date of valuation.

The fact that a project enhanced sale of the subject property reflects noncompensable elements renders it an imperfect indicator of the value the jury must determine; nevertheless, it may *assist* the jury's determination. For as we observed with respect to sales of comparable properties that were tainted by project enhancement, "such sales may also reflect recent increases in land values attributable to other factors, such as other new public or private improvements or zoning changes, which the owner of the condemned land is entitled to have included in a consideration of the market value of his land at the time of taking." (*Merced Irrigation Dist.* v. *Woolstenhulme, supra*, 4 Cal.3d at p. 501.) A trial court may properly conclude, therefore, that a project enhanced sale of the subject property could help the jury calculate its unenhanced value at the date of valuation. The presence of a single factor—the project enhanced value in the price paid—should not defeat the admissibility of the price so far as it is relevant as to other factors that are material.

■ The city cites our language in *Merced* to the effect that the owner of the subject property should not be empowered to set his own price. (4 Cal.3d at p. 492.) The spectre that the city conjures is ill-conceived. *Merced* prudently admonished as to the consequences of compensating a property owner for the full purchase price of his property, including project enhancement occurring after the date of probable inclusion. Such a rule would permit the property owner to write his own check, since whatever figure he had paid for the property would *be* its fair value at that date. *Merced* ruled that that figure is not the compensation to be paid for the property; it limited the owner's compensation to the value of the land without reference to noncompensable enhancement. Since *Merced* resolved the substantive issue of

---

[3]Sections 815 and 816 sanction the admission of sales of the subject property and comparable properties respectively "[w]hen relevant to the determination of the value of [the subject] property." In defining comparable sales, section 816 indicates that the purportedly comparable property must be sufficiently similar to the subject property that its sales price "may fairly be considered as shedding light on the value of the property being valued." Although the phrase "shedding light" does not appear in section 815, the standard of admissibility is the same for both sections. The transcendent requirement is that the evidence be "relevant" to the determination of the value of the subject property; section 816 simply contains a more specific statement of what renders evidence relevant, namely, a capacity to shed light on an issue.

compensation, it foreclosed the potential abuse to which it had alluded. It requires no support from an exclusionary rule.

The city essays to establish the per se inadmissibility of the 1968 sale by reasoning analogically from the inadmissibility of sales of the subject property after the filing of a lis pendens. (Evid. Code, § 815.) The lis pendens gives formal notice as a matter of record to any purchaser of the land that he is purchasing a lawsuit. The determination of the date of probable inclusion is not comparable; such determination hardly rises to the level of *record* notice. No procedure was available to Retlaw at the time of the purchase that could have authoritatively informed it that it was buying a lawsuit.[4]

As we have explained, the admissibility of the sales price of the subject property after the date of probable inclusion rests in the sound discretion of the trial court; that court did not abuse its discretion in the instant case. Initially, considerable dispute pivoted on whether the 1968 sale reflected any project enhancement.[5] Assuming arguendo that noncompensable project enhanced value did bloat the purchase price, the trial court might still have reasonably concluded that it would shed light on the unenhanced value of the land.[6] Nor is there any claim that the jury

---

[4]The city opines that a buyer who, as of the date of probable inclusion, did not know that the property fell within the project is not "knowledgeable." The price that an unknowledgeable buyer pays for property, it suggests, sheds no light upon the real value of the property. It is possible, however, for a buyer to possess some knowledge and lack other knowledge. For example, a buyer might be completely informed regarding the conversion of property to industrial use although he lacks knowledge of the impending project. Such a buyer stands no more entitled to compensation for project enhancement accruing after the date of probable inclusion than would a buyer fully informed about the project. Nonetheless, his knowledge of the possible industrial uses of the property would still make the price he paid for it a good estimate of its unenhanced value. The city's argument assumes that buyers are either omniscient or completely ignorant. Reality, needless to say, belies that false dichotomy.

[5]Retlaw's experts testified that the impact of the project on the 1968 purchase price was minimal. The city, however, points to the enormous appreciation of the property in the period immediately before the 1968 sale. In 1966, the subject property was sold for only $918,000, about 11 percent of the price it commanded in 1968. Retlaw's experts attributed the appreciation to other market factors. They also expressed their belief that Retlaw did not consider the project in determining what it would pay for the property in 1968.

[6]The trial court may properly have considered the fact that the city would have an opportunity to prove on cross-examination that the 1968 purchase price was, because it was considerably inflated by noncompensible project enhancement, a poor indicator of the property's value as of the date of probable inclusion. (See *People* v. *Reardon, supra,* 4 Cal.3d 50/, 513.) The jury is thus the ultimate judge of the degree of comparability. (3 Cal. Law Revision Com. Rep. (1961) Recommendations Relating to Evidence in Eminent Domain Proceedings (Oct. 1961) pp. A-50-A-51.)

was misinformed of the substantive rules of compensation. The trial court properly cautioned the jury about reliance upon the 1968 sale: "If you find that the purchase price of the 1968 purchase of the subject property was affected by knowledge of the proposed project, you should disregard the sale to the extent that it reflects such project enhanced value."

2. █ *The trial court did not err in permitting Cox to testify as to the trend in sales prices of noncomparable properties because that trend could possibly shed light on the appreciation of the subject property.*

The city contends that Cox's testimony concerning the trend in sales prices of noncomparable neighboring properties was irrelevant and prejudicial. Cox limited his testimony to the percentage increases in the prices paid for nearby properties; the testimony did not allude to the actual dollar amounts of any of the sales upon which the calculation rested. Upon analysis, the city's contention that price trend data based on dissimilar property can shed no light on the value of the subject property proves unpersuasive.

The courts of this jurisdiction have held on many occasions that the trend of sales prices of neighboring properties can illuminate the appreciation of the subject property. (See, e.g., *San Bernardino County Flood Control Dist.* v. *Sweet* (1967) 255 Cal.App.2d 889 [63 Cal.Rptr. 640]; *People* ex rel. *Dept. Pub. Wks.* v. *Silveira* (1965) 236 Cal.App.2d 604 [46 Cal.Rptr. 260]; *Covina Union High School Dist.* v. *Jobe* (1959) 174 Cal.App.2d 340 [345 P.2d 78].) Admittedly, the data in the cases cited above emanated from the sale of properties which, though dissimilar to the subject property in some aspects, generally compared closely to it. Although price trends for comparable property would no doubt be preferable,[7] we are not prepared to divest the trial court of the discretion to admit evidence of the price trend for noncomparable properties if it concludes that such evidence can shed light upon the value of the subject property. To deny such discretionary power would be to sanctify a wooden conception of comparability that would unjustifiably shackle the fact-finding process.[8]

---

[7]Cox testified that he could locate no properties comparable to the subject property within a reasonable proximity, and thus was forced to rely on the general price trend for all properties in the area.

[8]The definition of comparability in section 816 of the Evidence Code (see fn. 2, *ante,* at p. 481) serves a very specific purpose. That section seeks to prevent a party from representing that the value of the subject property is equal to the sales price of property with which it has very little in common. Consequently, it instructs the trial court to

The city emphasizes Cox's concession that the properties that formed the basis of his calculations were not comparable to the subject property and thus the prices at which they sold could shed no light upon its value. Cox's testimony, however, made clear that while he thought that the *absolute* sales prices of these properties could not "shed light" upon the absolute value of the subject property, he believed that the *relative* appreciation of those properties could "shed light" upon the relative appreciation of the subject property.[9] In *Traxler* v. *Thompson* (1970) 4 Cal.App.3d 278, 286 [84 Cal.Rptr. 211], the Court of Appeal underscored the obvious when it rooted the concept of relevancy in notions of logic and common sense. Neither logic nor common sense renders it manifest that the rate of appreciation of one piece of property cannot constitute good evidence of the rate of appreciation of a nearby parcel of property simply because their original prices were markedly different.

None of the cases upon which the city relies requires the exclusion of this price trend evidence. *Community Redevelopment Agency* v. *Hender-*

---

exclude evidence of a sale when the property sold is not sufficiently comparable to the subject property that their prices will be similar. Thus if a party plans to represent that the sales price approximates the value of the subject property, the court should first determine if it is reasonable that the price will approximate that value. The specific comparability requirement of section 816—that the property sold have a value approximating that of the subject property—should not govern when the sales price is not introduced on the theory that it approximates the price for which the subject property would have sold. The relevance of evidence must be evaluated by criteria that probe the purpose for which it was introduced. If price trend data are relevant, they can be admitted into evidence without regard to section 816. Evidence Code section 814 permits a witness to base his testimony on relevant evidence, "including but not limited to the matters listed in sections 815 to 821."

[9]The use Cox made of the price trend data was clear. After determining the market value of the property in May 1968 Cox determined its value on the date of valuation by computing the rate of appreciation for properties in the Palmdale area and applying that rate of appreciation to the May 1968 value of the subject property. Cox attempted to determine a price-trend rate that reflected no project enhancement. He thus reduced the appreciation rate he originally calculated by an amount that he thought, on the basis of his market survey, reflected project enhancement. When the trial court overruled the motion to exclude this evidence, it apparently instructed the jury that the evidence was received for the limited purpose of shedding light on the trend of project enhancement. The city correctly notes that Cox's price-trend data had, according to his claim, been cleansed of "project enhanced value," and thus could not have been relevant for the limited purpose for which the trial court admitted it. Most probably, the trial court temporarily confused the price trend with the market study that Cox had used to eliminate the project enhanced value. The trial court's misstatement, however, does not help the city's cause since the evidence could properly have been admitted for the general purpose of showing how Cox updated his 1968 estimate of the property's value. The city certainly cannot complain because Retlaw's evidence was limited to less than its proper scope. Finally, even if the admission of the testimony for that "impossible" purpose was error, it was not prejudicial. (See *infra* at pp. 487-488.)

*son* (1967) 251 Cal.App.2d 336 [59 Cal.Rptr. 311] and *Los Angeles etc. School Dist.* v. *Swensen* (1964) 226 Cal.App.2d 574 [38 Cal.Rptr. 214], properly held inadmissible evidence of the *absolute* sales prices of noncomparable property. They do not govern the present case in which the trial court admitted only the percentage increase in the sales price of other properties. Nor can the city cull support from *City of Rosemead* v. *Anderson* (1969) 270 Cal.App.2d 260 [75 Cal.Rptr. 575], in which the court ruled inadmissible the average sales price for a group of properties of doubtful comparability. The average sales price, of course, represented nothing but a concise summary of the irrelevant absolute price data. In contrast, the percentage change that Cox calculated yields only relative information; it is completely barren of objectionable absolute data.

Our decision should not be construed to hold that price-trend data based on dissimilar property are, as a rule, relevant. We reach a more modest conclusion: such evidence *may* be relevant. The trial court has considerable discretion to assay the relevance of proffered evidence. Consequently, the mere fact that a witness testifies that he thinks evidence of price trends for dissimilar property will serve to illuminate the valuation of the subject property will not insure the admissibility of such evidence. The trial court must consider the objection of the opposing party and admit the evidence only if it concludes that it has probative value. We cannot conclude that the trial court abused its discretion in the present case by determining that the price-trend data shed some light upon the value of the subject property.[10]

The city argues that the price-trend data, even if relevant, should have been excluded because they were likely to prejudice the jury. The argument apparently springs from the theory that Retlaw is, through subterfuge, insuring the admission of evidence that the jury would not ordinarily hear. If Cox had introduced the actual sales figures upon which he predicated his computations, the city's position would be more tenable. In that case, the jury would be compelled to sift carefully the

---

[10]The city never attempted to demonstrate that, in this case or in general, properties within a given vicinity with different initial prices appreciate at markedly different rates. In the absence of evidence suggesting that the appreciation rates were different, we see no objection to the introduction of the evidence. Given the purported lack of comparable properties, a decision to exclude this evidence may have compelled the complete abandonment of trending or reliance on an even more remote index of appreciation, such as a statewide land appreciation rate or a general index of national prices. It is apparent that the degree of light certain evidence will shed upon the valuation process turns, in part, on the evidentiary alternatives open to the parties.

relevant percentage figures from the irrelevant and possibly prejudicial absolute figures. In the present case, however, the testimony permitted no such confusion. Since the absolute purchase prices were not mentioned at any time, the jury had no opportunity to mistake them for the purchase prices of comparable properties within the meaning of section 816.

Moreover, even if the admission of the price-trend data somehow prejudiced the city, it was not necessarily error. Section 352 of the Evidence Code confers the trial court with discretion to balance the probative value of evidence against its possible prejudicial effects. Consequently, evidence might be admissible even though somewhat prejudicial. There is no basis on this record for concluding that the trial court abused the discretion committed to it by section 352.

3. ■ *The trial court did not err in refusing to strike Metcalfe's testimony since that testimony rested neither on Retlaw's peculiar plans for the property nor upon exceedingly speculative matters.*

The city argues that the trial court should have stricken Metcalfe's testimony concerning the fair market value of the subject property because it was predicated upon improper considerations.[11] (Evid. Code, § 803.) The city cites two such improper considerations: first, Retlaw's plan for developing the property and second, the possibility that the user of the property would obtain access to the runways at Palmdale Airport. We conclude that Metcalfe's testimony was not based upon improper matters and, consequently, that the trial court correctly permitted it to stand.

The city correctly observes that evidence of value based upon an owner's projected plan is not admissible. (*Sacramento etc. R.R. Co.* v. *Heilbron* (1909) 156 Cal. 408 [104 P. 979]; *People* ex rel. *State Park Com.* v. *Johnson* (1962) 203 Cal.App.2d 712, 717 [22 Cal.Rptr. 149]; *County of Los Angeles* v. *Bean* (1959) 176 Cal.App.2d 521, 528 [1 Cal.Rptr. 464].) This rule, however, merely proscribes the determination of the value of property based upon an owner's speculative scheme. (5 Nichols, Eminent

---

[11]Retlaw contends that the city cannot now argue that the trial court should have stricken Metcalfe's testimony since it made no motion to strike it at trial. The city observes that it objected in advance to Metcalfe's testimony both orally and in writing, and did not formally move to have the testimony stricken after the fact because the trial court's continual denial of its motions to exclude portions of the testimony made clear the futility of such a motion. Since we conclude that the evidence was properly admitted in any event, we need not rely upon this procedural ground.

Domain (3d ed. 1969) § 18.11[a].) Metcalfe made no such attempt to capitalize the earnings stream of a hypothetical business; he simply took cognizance of the fact that Retlaw proposed to put the land to industrial use. The fact that Retlaw, an informed buyer, bought the land for industrial use was one of many indicators that the highest and best use of the land was industrial development.[12] Without doubt, an expert witness should attempt to ascertain the general use to which property can profitably be put. Since Metcalfe did no more, his testimony was unobjectionable.

The city's second objection to Metcalfe's testimony was that it rested upon speculative considerations—in particular, the "possibility" that the user of the subject property might obtain access to the facilities of the Palmdale Airport. The city insists that since the property has never enjoyed a right of access to the airport, and since Metcalfe established no "reasonable probability" that the user of the property would obtain such access, the possibility of such access was too speculative to enter the calculation of the property's value.

The problem with the city's position is that the record permits the conclusion that the user of the property had a "reasonable probability" of obtaining access to the airport.[13] For one thing, Lockheed Aircraft Co. had recently procured a nearby parcel of land and subsequently obtained access to the airport. The user of Retlaw's property might enjoy similar fortune. Moreover, evidence adduced at trial established that the United States Air Force, which owned the airport, had promulgated a step procedure for obtaining access to the airport. Finally, assuming that Metcalfe should not have considered the possibility of the user of the Retlaw property obtaining access to the Palmdale Airport, the city has not demonstrated that this consideration so distorted Metcalfe's estimate that his entire testimony should have been stricken. (See *City of Gilroy* v. *Filice* (1963) 221 Cal.App.2d 259, 271 [34 Cal.Rptr. 368].)

---

[12]The record provides considerable evidence supporting Metcalfe's conclusion that industrial development was the highest and best use of the property. The proximity of the land to the airport, the fact that most of the property was zoned for airport industrial use, and a recent industrial venture by Lockheed on nearby land all point toward industrial use of the subject property. Not surprisingly, Metcalfe opined that he "probably would have arrived at the same highest and best use without Retlaw having bought the property for the same use."

[13]The city maintains that our decision in *People* v. *Dunn* (1956) 46 Cal.2d 639, 642 [297 P.2d 964] establishes that a contingency must be "reasonably probable" in order to properly enter the valuation process. *Dunn* dealt with potential changes in the zoning laws. Since we conclude that the reasonable probability standard is satisfied in this case, we need not determine if a less exacting standard should apply to potential contractual agreements.

4. ██ *The trial court did not mislead the jury by instructing it on the issue of "active demand" or by failing to supplement its instruction with that proffered by the city.*

The city contends that the trial court incorrectly instructed the jury on the issue of potential demand for the subject property. Specifically, it objects to the instruction that "[i]t is not required that there be proof that any designated person is ready, willing and able to buy the property nor that there is active demand for the property in order to establish its fair market value." The city concedes that the instruction accurately states the law. It argues, however, that the instruction unnecessarily focuses the attention of the jury on the fact that there need be no demonstration of active demand for the property. The instruction, we conclude, served a legitimate purpose. The city had attempted at trial to prove that no buyers stood immediately prepared to purchase the subject property. The instruction cautioned the jury that this was not dispositive of the issue of market value.

The city further suggests that the trial court compounded its error by refusing to instruct the jury that "[i]n determining fair market value, you should consider whether the evidence tends to show a reasonable possibility of demand within a reasonable time." The court's refusal so to instruct the jury was proper since the requested instruction would have essentially duplicated other instructions which the court did give to the jury.[14]

5. ██ *The trial court did not err in excluding the testimony of Stoneman since that testimony would have had little probative value and might have protracted or confused the proceedings.*

---

[14]The requested instruction would have overlapped substantially with BAJI Nos. 11.73 and 11.74 which the trial court tendered to the jury. BAJI No. 11.73 states, in pertinent part: " 'Fair market value' is defined as the highest price, in terms of money, for which the subject property would have sold on the open market on January 7, 1974, the seller having a reasonable time within which to sell, and being willing to sell but not forced to do so; the buyer being ready, willing and able to buy but not forced to do so, and having a reasonable time and full opportunity to investigate the property in question and to determine its condition, suitability for use, and all of the things about the property that would naturally and reasonably affect its market value."

BAJI No. 11.74 states: "What constitutes a reasonable time to find a purchaser willing to buy, depends upon the circumstances and conditions surrounding the particular piece of property in question. It would be such time as, considering the size and character of the property, its location, and the market, would reasonably be necessary in order to dispose of the same at its fair market value."

The city objects to the trial court's exclusion of the proffered testimony of Stoneman, a purchaser of real estate in the Palmdale area. The testimony would have proven, at most, that precise information about the scope of the project was available at the time of the 1968 sale.[15] This testimony purportedly would have shed light upon the extent to which project enhancement inflated the 1968 sales price of the subject property. The trial court exercised its discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

We find no abuse of discretion. To begin with, the probative value of the evidence was limited. Stoneman, after all, was only one buyer, and the state of his knowledge is not necessarily reflective of the knowledge of other buyers. Moreover, the proffered testimony said nothing about the effect of Stoneman's knowledge upon the price paid for the properties which he purchased in 1968; consequently, it yielded no information about the existence or magnitude of project enhancement. Against this meager probative value, the trial court balanced the disadvantages of admitting the testimony. Beyond confronting the jury with evidence which may have been misleading, the testimony would have invited the protraction of an already lengthy trial. Retlaw, to counterbalance whatever probative value Stoneman's testimony might have, could have solicited and introduced the testimony of any number of purchasers or potential purchasers of land in the Palmdale area who were *not* aware of the scope of the project at the time of the 1968 sale. The trial court properly exercised its discretion in excluding the offered testimony.

6. ■ *The trial court did not err in refusing to grant a new trial when the jury's award fell well within the estimates of the expert appraisers.*

Finally, the city urges us to reverse the judgment because the damages awarded were excessive. The record abounds with conflicting evidence on the issue of value. Retlaw's experts estimated the value of the property at about $21 million; the city's experts estimated its value at about $4 million. Both parties adduced considerable evidence in support

---

[15]Apparently, the testimony would have proven that one could have *bought* the relevant information at the time of the 1968 purchase. As Retlaw observes, the very fact that a potential purchaser of property would have had to pay for the information suggests that it was not generally available.

of their experts' conclusions. The jury award of $14,350,000 was reasonable in light of the evidence.

It is not the province of this court to substitute its evaluation of the evidence for that of the jury. So long as the jury's award is reasonable, we shall uphold it. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) The city attempts to derive support from *Southern Cal. Edison Co.* v. *Gemmill* (1938) 30 Cal.App.2d 23 [85 P.2d 500], in which the court upheld the grant of a new trial on the basis that the damages awarded were excessive despite the fact that the award fell within the range testified to by the expert witnesses. The crucial distinction is that in *Gemmill* the appellate court merely upheld the trial court's discretion to grant a new trial; it did not require a new trial despite the trial court's contrary ruling as the city would have us do here.

Accordingly, we affirm the judgment below.

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.