[Civ. Nos. 64246, 65014. Second Dist., Div. Two. Mar. 8, 1983.]

REDEVELOPMENT AGENCY OF THE CITY OF LONG BEACH,
Plaintiff and Appellant, v.
FIRST CHRISTIAN CHURCH OF LONG BEACH,
Defendant and Respondent.

**COUNSEL**

Robert W. Parkin, City Attorney, Oliver, Stoever & Laskin, Richard Laskin, Ronald J. Einboden and Roberta S. Kallan for Plaintiff and Appellant.

Meserve, Mumper & Hughes, Hodge L. Dolle, Jr., and Judith P. Meyer for Defendant and Respondent.

## OPINION

**COMPTON, J.**—Plaintiff, Redevelopment Agency of Long Beach, appeals from a judgment entered in a condemnation proceeding in which the jury fixed the value of certain real property of the First Christian Church of Long Beach (defendant) at $3,027,291. Plaintiff also appeals the trial court's subsequent order awarding defendant $261,676 in litigation expenses, including attorney's fees.

Plaintiff contends that the trial court committed prejudicial error by excluding items of evidence offered by the agency on value and misinstructing the jury on applicable pertinent law. Plaintiff further argues that expenses attendant to the instant litigation should not have been awarded to defendant. We affirm both the judgment and the order awarding costs.

The subject property, situated in downtown Long Beach, consists of two lots totaling approximately 45,000 square feet improved with a 60,000-square foot building. The church building, constructed between 1919 and 1921, included kitchen facilities, offices, classrooms, numerous multipurpose rooms, a basement and balcony area. Portions of the building were rebuilt following the devastating Long Beach earthquake of 1933. The main sanctuary, originally designed to seat slightly more than 2,000 persons, was richly decorated with molded plaster, stained glass windows, carved and curved pews, and other ornamental detail. As of the date of evaluation, the church had a congregation of about 200 persons. On occasions, however, the facilities were rented to outside groups for various functions.

As might be expected the expert witnesses for the parties varied widely as to the value of the property. Plaintiff's appraiser fixed the total value of the property at $1,096,100, of which $315,000 was attributable to the land. Defendant's appraiser fixed the total value at $4.6 million, of which $765,000 was attributable to the land.

While the parties differed substantially on the land value, the major issue was obviously the value of the church building itself. At the risk of oversimplifying the complicated testimony, it appears that plaintiff's expert estimated the present cost of *replacing* the building and depreciated that figure by 75 percent.

On the other hand, defendant's expert estimated the cost of *reproducing*[1] the building and then depreciated that figure by a factor of slightly less than 40 percent.

■ The ultimate goal in any eminent domain proceeding is of course to determine constitutionally required "just compensation." *That compensation is to be measured by what the owner lost and not what the condemner has gained.* (*People* v. *La Macchia* (1953) 41 Cal.2d 738 [264 P.2d 15].)

Building on that rather simply stated concept both the Legislature and the courts have erected a considerable number of rules, some of which are patently artificial and arbitrary but whose stated objective is to enable a trier of fact to determine, in an atmosphere free of excessive speculation and irrelevant considerations, what is just compensation.

Generally speaking, the most widely used and perhaps most easily applied concept is that of "fair market value." (Code Civ. Proc., § 1263.320, subdivision (a).)[2] But even that test, which is described as what a willing buyer would pay to a willing seller under circumstances totally free from external pressures, may not, in every case, achieve a correct result for the reason that in eminent domain the property owner generally is forced into accepting the price of a market he did not willingly enter because of lack of a desire to sell at any price.

The fair market value method is generally applied by way of market data on sales of comparable property. (Evid. Code, § 816.)[3] The economic reality of

---

[1] The Appraisal Terminology Handbook states that: "Replacement cost is the cost of construction at current prices of a building having utility equivalent to the building being appraised, but built with modern materials and according to current standards, design and layout. . . . Reproduction cost is the cost of construction at current prices of an exact duplicate or a replica using the same materials, the same construction standards, the design, layout, quality of workmanship, and embodying all of the deficiencies, superadequacies and obsolescence of the subject building."

[2] Code of Civil Procedure section 1263.320, subdivision (a) provides: "The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available."

[3] Evidence Code section 816 provides: "When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the price of other terms and circumstances of any sale or contract to sell and purchase comparable property if the sale or contract was freely made in good faith within a reasonable time before or after the date of valuation. In order to be considered comparable, the sale or contract must have been made sufficiently near in time to the date of valuation, and the property sold must be located sufficiently near the property being valued, and must be sufficiently alike in respect to character, size, situation, usability, and improvements, to make it clear that the property sold and the property being valued are comparable in value and that the price realized for the property sold may fairly be considered as shedding light on the value of the property being valued."

course is that certain types of buildings such as churches are not, as such, regularly bought and sold in the commercial market and to ordinary buyers of real estate have no greater value than the use which can be made of the land free of the building. The constitutional mandate of just compensation, of course, would not be met if public agencies could thus exercise the power of eminent domain by simply paying for the value of the raw land when it is occupied by some special type of building.

In recognition of this problem, the Legislature has provided in Code of Civil Procedure section 1263.320, subdivision (b): "The fair market value of property taken for which there is no relevant market is its value on the date of valuation as determined by any method of valuation that is just and equitable."

Recognized alternatives to the market data approach to valuation are reproduction or replacement costs less depreciation or obsolescence. (Evid. Code, § 820.)[4] These methods, in reality, provide a more just and equitable approach in evaluating special use buildings such as churches.

It is apparent that in using these latter methods, under circumstances such as in the case at bench, depreciation and obsolescence become the major focal point of controversy. We hasten to point out, however, that in our view depreciation and obsolescence should not be used as a "back door" method of nullifying the reproduction and replacement approach to valuation. For example, a large ornate church, as here, because it was used by only a small congregation might be viewed by some as obsolete and having no value beyond that of the land itself. The church, however, does have value to the congregation and the congregation is entitled to compensation therefor. A property owner should not be penalized by application of a concept of locational or functional obsolescence simply because it happens to be in the wrong place at the wrong time when a condemning agency decides to make its move.

■ Plaintiff's first claim of error here has its basis in what was plaintiff's unstated but inferential approach. That approach was simply that the market value of the church was the value of the land on which it stood. Plaintiff attempted, as we will describe, to advance that approach under the guise of comparable sales and a so-called "market survey" which purported to be directed at the element of "depreciation."

---

[4]Evidence Code section 820 provides: "When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the value of the property or property interest being valued as indicated by the value of the land together with the cost of replacing or reproducing the existing improvements thereon, if the improvements enhance the value of the property or property interest for its highest and best use, less whatever depreciation or obsolescence the improvements have suffered."

Although plaintiff was unsuccessful in getting much of this evidence before the jury it was successful, contrary to its own desires, in establishing that there was no relevant market for churches, thus opening the way for use of the reproduction and replacement methods of valuation.

Plaintiff's expert developed evidence as to sales of five churches—one each in Long Beach, Glendale, Riverside, Highland Park and Redondo Beach. In his deposition, plaintiff's expert conceded that only one of the five sales would qualify as a direct comparable sale. At oral argument before this court counsel for plaintiff conceded that three of the sales would not qualify as direct comparable sales. One of the sales, i.e., the Long Beach sale, was admitted as a comparable sale. The Glendale sale was found by the trial court also to be a comparable sale but it was later barred from use in evidence for reasons which we will discuss, *infra*.

Plaintiff purported to have its expert testify that as a basis for his opinion he made a "market survey" of the five sales and concluded that in each instance, when compared to sales of raw land in the surrounding vicinity, the price paid for the church property was the same as would be paid for the equivalent amount of unimproved land. From this he extrapolated that the church buildings had been depreciated 100 percent or "at least 80% in all cases studied."

We have been cited to no authority, nor has our research disclosed any, permitting the use of a sale price of other property to establish the percentage of depreciation of the property being condemned.

Sales of *noncomparable* property are irrelevant to the value of the property being condemned. Plaintiff's attempt to bring evidence of admittedly noncomparable sales before the jury involved the expert appraiser in the process of expressing an opinion on the apportionment of the sales price of the other property between land and improvement. This would have run afoul of Evidence Code section 822, subdivision (a)(4), which provides that "In an eminent domain or inverse condemnation proceeding, notwithstanding the provisions of Sections 814 to 821, the following matter is inadmissible as evidence and shall not be taken into account as a basis for an opinion as to the value of the property: . . . An opinion as to the value of any property or property interest other than that being valued."

Further, the trial court was well within its discretion under Evidence Code section 352 in refusing to admit the evidence. In *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478, 502 [93 Cal.Rptr. 833, 483 P.2d 1], our Supreme Court stated: "As the drafters of section 822, subdivision (d) [the forerunner of section 822(a)(4)], indicated, in excluding 'opinion' evidence as

to the value of property other than the condemned property, the section simply attempts to avoid the host of collateral issues, and the consequent prolongation of eminent domain trials, that would arise if appraisers were permitted to testify, under these liberalized evidentiary rules, as to their 'opinion' of the value of other property."

Plaintiff suffered no prejudice in any event. Although it was denied use of its study to fix a high rate of depreciation for the subject property, it was allowed to present evidence similar in character and substance to that contained in the market analysis. (See Evid. Code, § 803.) In this regard, plaintiff's appraiser opined that the aged and dilapidated condition of downtown Long Beach substantially decreased the value of the church structure with each passing year. The same expert, in testifying that overall depreciation was 75 percent, also made it clear that as redevelopment continued in the area, the land value of the property would climb. Unlike the market study, this testimony directly related the depreciation of the subject property to its surrounding area.

■ As mentioned earlier the trial court excluded one of plaintiff's two comparable sales, the Glendale sale, based upon its interpretation of exhibit "A" to the Los Angeles Superior Court's Eminent Domain Policy Memorandum. That exhibit, entitled "Requirements for Valuation Data," orders the parties in a condemnation proceeding to submit appraisal reports, upon which they intend to rely at the time of trial, "on or before five days before the final pretrial conference." Data which is not exchanged within this specified time period is excluded from trial "[e]xcept as set forth herein, and except for the purpose of rebuttal." For evidence which is subsequently discovered and desired to be used at trial, exhibit "A" requires the submitting party to "immediately notify the other party to this effect, and provide the other party with the same information, and show *good cause to the court,* either in Department 43 or the trial department that he should be permitted to use such information at the trial." (Italics added.)

These provisions of the policy memorandum, promulgated pursuant to Code of Civil Procedure section 1258.300 and approved by us in *Swartzman* v. *Superior Court* (1964) 231 Cal.App.2d 195, 200-201 [41 Cal.Rptr. 721], give the trial court wide discretion in determining whether or not good cause has been shown for the delay in presenting valuation data to an opposing party. (Cf. *Regents of University of California* v. *Morris* (1968) 266 Cal.App.2d 616, 632 [72 Cal.Rptr. 406].) Such a determination naturally hinges upon a finding by the court that the opposing party has or will suffer prejudice if the evidence is admitted at trial. (Cf. Code Civ. Proc., § 1258.290, subd. (b); see also *County of Monterey* v. *W. W. Leasing Unlimited* (1980) 109 Cal.App.3d 636, 642-645 [167 Cal.Rptr. 12].)

On appeal, we will uphold the trial court's ruling if it is supported by substantial evidence. In order for us to reverse a judgment because of an erroneous ruling, there must be a clear showing of an abuse of discretion resulting in a miscarriage of justice.

Based upon the record before us, we cannot conclude that the lower court improperly excluded the Glendale sale from the jury's consideration. The testimony taken during the hearing on this issue established that the sale originally was not intended to be used by plaintiff as a direct comparable but only as one item in its depreciation study.

This initial determination was made more than six months before trial and approximately two months after plaintiff's appraiser discovered that a church sale had occurred in Glendale sometime in 1976. Preliminary investigation of the property came to an abrupt end after the appraiser had difficulty in reaching the pastor of the church by phone.

Apparently, however, the data that was acquired was sufficient to justify its inclusion in the market study eventually furnished defendant. In both the appraisal report and his deposition, the expert assured the defense that the sale would not be offered as a direct comparable. Defense counsel based a large part of his trial strategy on this assurance.

Not until almost two weeks before trial did plaintiff's appraiser resume his investigation of the Glendale property by ordering a copy of the deed of sale. After receipt of this document the appraiser contacted one of the signators and obtained additional detail regarding the property.

Approximately one week before trial plaintiff contacted defense counsel and informed him that the Glendale church would be used as a direct comparable. Defendant, however, did not raise the issue of pretrial compliance until after the trial court determined that the sale could be introduced to prove fair market value.

Although defendant possessed some information about the property via the market study, we agree with the trial court's assessment that the extent of the data provided was inadequate to allow the defense to challenge the sale as a direct comparable under Evidence Code section 816. After a full hearing on the issue, the trial court was in a particularly advantageous position to evaluate defense counsel's performance and to form the opinion that defendant was not given sufficient pretrial information about the physical characteristics of the church or the sale to conduct a studied cross-examination of plaintiff's expert. (Cf. *Regents of University of California* v. *Morris, supra,* 266 Cal.App.2d at p. 632.)

The Glendale church itself was no longer standing, having been demolished years earlier. Clearly, any investigation pertaining to its relevant history would have taken considerable time and effort. Nothing in the record explains why plaintiff's appraiser waited until two weeks before trial to continue his study of this particular sale. The documents and information he ultimately obtained could have been discovered months earlier in the exercise of reasonable diligence. Good cause for the delay was not established.

Relying on the Supreme Court's holding in *City of Los Angeles* v. *Retlaw Enterprises, Inc.* (1976) 16 Cal.3d 473, 485-487 [128 Cal.Rptr. 436, 546 P.2d 1380], plaintiff attempts to analogize its use of noncomparable sales to studies that analyze the trend of market prices. In *Retlaw*, the condemnee's appraiser was permitted to compute the percentage rate of appreciation for all property in a limited and defined area. This calculation, in conjunction with other market data, then was used to value the condemned parcels of land. Unlike the plaintiff's appraiser in the instant case, Retlaw's experts did not need to offer an opinion as to the value of any property other than the one being condemned. Instead, *actual* sales' values were used in determining the rate of appreciation. Moreover, the Supreme Court cautioned that price trend data was admissible only when the trial court, in proper exercise of its discretion, found it to have probative value. (*Retlaw, supra,* at p. 897.)

Plaintiff further complains that the trial court should have permitted one of its experts, Robert Daigh, to testify to the nature, extent, and cost of bringing the First Christian Church of Long Beach into compliance with current earthquake standards. Daigh was limited to testifying that the church structure itself needed extensive repairs and that the single most important indicator of physical deterioration and obsolescence was exposure to earthquake hazard. The court's decision to limit the testimony was based upon a finding that the matters relied upon by Daigh in forming his opinion were too speculative and conjectural, and that his qualifications did not sufficiently relate to the subjects about which he was asked to express an opinion.

Preliminarily we note that a trial court's duty to determine the precise subjects about which an expert may testify is no easy task. The process frequently involves making an extremely close judgment call on subject matter that is, to say the least, esoteric. For this reason the rule has developed that it is for the trial court, in the exercise of sound discretion, to determine the competency and qualifications of an expert witness to give an opinion, and its ruling will not be disturbed on appeal unless a manifest abuse of that discretion is shown. (*Miller* v. *Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 701 [106 Cal.Rptr. 1, 505 P.2d 193]; *Pobor* v. *Western Pac. R.R. Co.* (1961) 55 Cal.2d 314, 326 [11 Cal.Rptr. 106, 359 P.2d 474].)

"The test as to whether the trial court properly exercised its discretion is whether or not the offered expert disclosed sufficient knowledge on the subject to entitle his opinion to go to the jury [citation] and not whether this court on the showing made below would have permitted him to testify." (*People* v. *Hayward Bldg. Materials Co.* (1963) 213 Cal.App.2d 457, 471 [28 Cal.Rptr. 782].) ■ Similarly, appellate courts give wide latitude to trial courts in determining whether the matters relied upon by experts in forming opinions are too speculative. (*Solis* v. *Southern Cal. Rapid Transit Dist.* (1980) 105 Cal.App.3d 382, 389-390 [164 Cal.Rptr. 343].)

■ Although the record in the instant case discloses that Mr. Daigh was a highly qualified real estate appraiser and building contractor, we cannot say that the trial court committed an abuse of discretion in limiting his testimony as heretofore described. In any event, the opinions testified to by this expert, in conjunction with the testimony of plaintiff's other expert witnesses, assures us that the plaintiff's case suffered no prejudice.

During a hearing conducted outside the presence of the jury, Daigh testified that he was unfamiliar with the actual structural changes made in the church after the 1933 Long Beach earthquake. Although he had conducted examinations of similar type buildings in the vicinity of the subject property, Daigh was unaware of any actual tests that had been undertaken to measure the shear strength of the church's walls prior to its demolition. The expert further testified that he was not a structural engineer and that it would require a person with such a background to assess the *actual* structural deficiencies existing in any building. Daigh made clear that he had discussed the issue of repairs with the city's senior civil engineer and had been told what generally needed to be accomplished in order to bring the church up to code standard. The engineer, as with Daigh himself, had formed his opinion without having any precise knowledge of the building's actual condition and without conducting any specific tests.

Based upon the foregoing, the court made its decision to exclude from evidence Daigh's opinion as to the extent of repair work needed and the cost of such work—somewhere between $1 million and $2 million. This ruling did not constitute an abuse of the court's discretion. This is especially true in light of the fact that the expert did testify that the church "had a very limited lifespan before substantial refurbishment and structural stabilization would have to be made." Moreover, he opined that such work would have to be completed before 1984, and that many similar buildings in the area had been demolished because the cost of correcting structural deficiencies was too high. Accordingly, even were we to assume that the court erred, the error was not of "sufficient gravity as to create a miscarriage of justice." (*General Steel & Wire Co.* v. *Stryco Mfg. Co.* (1963) 213 Cal.App.2d 495 [28 Cal.Rptr. 769].)

■ Plaintiff's claims of error in the jury instructions are not well taken. The trial court instructed the jury on the definition of fair market value. (BAJI No. 11.73.) Following that the court instructed in the language of Code of Civil Procedure section 1263.320, subdivision (b) that where there was no relevant market, any just and equitable market method of valuation could be used.

Plaintiff takes exception to the latter contending that it misled the jury into believing there was no relevant market for church property. Plaintiff goes on to argue that the instruction threw the valuation process "wide open" and gave the jury unbridled discretion to award whatever was "just and equitable." We find these arguments unpersuasive.

The instruction was a correct statement of the law being verbatim from the statute and was clearly applicable since as a matter of fact there is no relevant market for churches.

■ Plaintiff further contends that the lower court's modification of BAJI No. 11.82(6) (1977 revision)[5] blurred the distinction between reproduction and replacement costs. The contested instruction read as follows: "Another basis for estimating fair market value is the replacement and reproduction cost method. This method may be considered in all cases and has particular applicability to special use properties, as to which there is limited market data available in the form of comparable sales. A witness using this method may consider the value of the property being valued as indicated by the value of the land together with the cost of replacing or reproducing the existing improvements thereon less whatever depreciation or obsolescence the improvements have suffered."

Plaintiff maintains that the court's improper use of the conjunctive "and" between the words "replacement" and "reproduction" equated the two valuation concepts, thereby confusing the jury and prejudicing its case. Although plaintiff correctly asserts that Evidence Code section 816, as well as BAJI No. 11.82(6) (1977 revision) uses the disjunctive "or" instead of the conjunctive "and," we find the court's error to be de minimis. (Cf. *Mayfield* v. *Fidelity & Casualty Co.* (1936) 16 Cal.App.2d 611, 629-630 [61 P.2d 83].) During trial, one of plaintiff's experts, Mr. Daigh, testified in great detail as to the way in which the terms "reproduction" and "replacement" are used by professional appraisers. At no time, however, did plaintiff request that the words be defined for the jury and made part of the instructions given. Such a request would have

---

[5]BAJI No. 11.82(6), unmodified, states: "A witness may also consider the value of the property being valued as indicated by the value of the land together with the cost of replacing or reproducing the existing improvements thereon, if the improvements enhance the value of the property or property interest for its highest and best use, less whatever depreciation or obsolescence the improvements have suffered."

cured any ambiguity, if any existed, in the meaning of these terms. It is well established that when a party complains that any particular instruction is too general, lacks clarity, or is incomplete, the complaint must be coupled with a request for an additional or qualifying instruction in order to have the error reviewed on appeal. (*Townsend* v. *Butterfield* (1914) 168 Cal. 564, 569 [143 P. 760]; 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 194, pp. 3013-3014.). The absence of any such request in the record before us makes it unnecessary to explore the issue in any greater detail.

Plaintiff's complaint that the instructions distorted the law by giving greater emphasis and significance to the reproduction method of valuation is meritless. ■ In condemnation actions, California courts have long recognized what has been referred to as the "appraisal trinity." (*State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Stevenson* (1970) 5 Cal.App.3d 60, 63 [84 Cal.Rptr. 742].) This term encompasses three methods or approaches used by appraisers to determine the fair market value of real estate: (1) the current cost of reproducing (or replacing) the property less depreciation from all sources; (2) the "market data" value as indicated by recent sale of comparable properties; and (3) the "income approach," or the value of which the property's net earning power will support based upon the capitalization of net income. (*Stevenson, supra,* at p. 63; *State of Cal.* ex rel. *State Pub. Wks. Bd.* v. *Covich* (1968) 260 Cal.App.2d 663, 665-666 [67 Cal.Rptr. 280].) In 1965, the state Legislature codified these three approaches in Evidence Code sections 815-820. A qualified appraiser in an eminent domain proceeding may use one or more of these valuation techniques to ascertain the fair market value of the condemned property. (*Stevenson, supra,* 5 Cal.App.3d at p. 63.)

As we earlier observed, underlying the entire valuation process is the concept of "just compensation." The principle sought to be achieved by this concept "is to reimburse the owner for the property interest taken and to place the owner in as good a position pecuniarily as if the property had not been taken." (*People* ex rel. *Dept. of Transportation* v. *Southern Pacific Transportation Co.* (1978) 84 Cal.App.3d 315, 324 [148 Cal.Rpr. 535].) Accordingly, neither the Legislature nor the courts of this state have singled out any one appraisal technique as an exclusive method of valuation. (*Napa Union High School Dist.* v. *Lewis* (1958) 158 Cal.App.2d 69, 73 [322 P.2d 39].) In most instances, the nature of the property condemned will determine which of the three approaches provides the best estimate of fair market value. Naturally, the condemnee will seek to employ that method which establishes the highest approximation of value and the condemner, the lowest. The jury, after hearing evidence from both parties and being instructed on the law by the court, must sift through the morass of conflicting testimony and determine the level of just compensation.

■ Applying the familiar rule that jury instructions must be viewed as a whole (*Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 464 [136

Cal.Rptr. 653]), we cannot conclude that defendant's theory of the case received undue emphasis. Plaintiff was not shackled with an instruction that directed the jury to rely upon only one approach in arriving at the church's fair market value. Instead, the jurors were presented with all possible theories as to the proper method of determining just compensation. The statement appearing in the trial court's modified version of BAJI No. 11.82(6) (1977 revision) that the replacement/reproduction method of valuation "may be considered in all cases and has particular applicability to special use properties, as to which there is limited market data available in the form of comparable sales," succinctly summarized the pertinent law without drawing the jury's attention to any particular facts or theories testified to at trial.

Finally, we consider whether the expenses incurred by defendant during the course of the instant litigation were properly awarded.

■ Code of Civil Procedure section 1250.410 is designed to protect the landowner from being forced unnecessarily to litigate the value of the property sought to be condemned in an action for eminent domain. It provides that where the condemner's offer to the landowner is unreasonable, and the condemnee's demand is reasonable, the condemner must pay the condemnee for the cost of the ensuing litigation. Pursuant to statute, the issue of the reasonableness of the two competing offers is viewed in the light of the evidence admitted and the compensation awarded in the proceeding. (Code Civ. Proc., § 1250.410, subd. (b).)

■ "Reasonableness of the final offer and demand presents factual issues which depend not only upon the percentage of difference in the monetary amounts of the offer and demand but also on good faith, care and accuracy in the determination of those amounts, all of which are matters to be evaluated by the fact finder." (*Coachella Valley County Water Dist.* v. *Dreyfuss* (1979) 91 Cal.App.3d 949, 958 [154 Cal.Rptr. 467]; *Lake County Sanitation Dist.* v. *Schultz* (1978) 85 Cal.App.3d 658, 668 [149 Cal.Rptr. 717]; *City of El Monte* v. *Ramirez* (1982) 128 Cal.App.3d 1005, 1012 [180 Cal.Rptr. 690].) The trial court's determination of reasonableness must be upheld on appeal if supported by substantial evidence. (*Los Angeles County Flood Control Dist.* v. *Mindlin* (1980) 106 Cal.App.3d 698, 717 [165 Cal.Rptr. 233].)

■ Applying these principles to the instant case, we cannot conclude that as a matter of law plaintiff's offer was reasonable. While we realize that the determination of reasonableness is not one of simple mathematical comparisons, we cannot ignore what the figures tell us about the effort of the parties in attempting to settle the dispute prior to trial. Here, plaintiff made a final offer of compensation in the sum of $1,525,000. At trial, plaintiff's appraisers estimated the fair market value of the church to be $1,096,100. Although

defendant's experts prior to trial determined the subject property to be worth $4.77 million, the final settlement demand was $3.7 million. After considering the evidence, the jury found in favor of defendant and awarded $3,027,291. Accordingly, plaintiff's final offer was approximately 50 percent of the jury verdict or, in absolute terms, $1,502,291 less than the amount awarded. The proportional difference between the final offer and demand was approximately 32 percent. While plaintiff increased its offer by $428,900 over its appraiser's estimate of fair market value, defendant decreased its demand by $1.07 million.

Based upon these calculations we reasonably may infer that plaintiff gave little, if any, weight to the theories and findings of defendant's appraisers. This is especially true in light of the wide disparity between the parties on the issue of depreciation rates. We must assume that the court below paid heed to this court's admonition in *County of Los Angeles* v. *Kranz* (1977) 65 Cal.App.3d 656, 659 [135 Cal.Rptr. 473], to consider in addition to the proportional difference between offer and demand "the good faith, care and accuracy in the method of determination of offer and demand." The trial judge had before him, when considering the motion for litigation expenses, all of the evidence adduced at trial, the evidence presented in support of and in opposition to the motion for litigation expenses, the respective statutory offers and demands of the parties, and the verdict of the jury on the issue of fair market value. "In addition, the trial court had the benefit of hearing all of the evidence including the respective reasons given by each witness for his opinion of value." (*City of El Monte* v. *Ramirez, supra,* 128 Cal.App.3d at p. 1012.) Accordingly, we cannot say that the trial court based its ruling on arbitrary or capricious considerations. There was no abuse of discretion in granting defendant's motion for litigation expenses.

■ In a memorandum of intended decision, the trial court set forth in great detail the factors justifying its award of $237,000 in attorney fees. Plaintiff argues that recovery should not have exceeded $150,000 by reason of a contingent fee agreement entered into by the church and defense counsel soon after commencement of the action. Said agreement fixed the maximum amount of compensation payable at $150,000. Several months before trial, however, counsel requested and received a modification of this original contract. Accordingly, the church obligated itself to pay all reasonable costs incurred during the course of litigation.

The trial court calculated the amount of the award based primarily on the actual hours devoted to the litigation of the case by trial counsel and his associates. For the most part, the contingent fee agreement was ignored. The expenses recovered included only those reasonably necessary in the defense of the action. There was no abuse of discretion. (*La Mesa-Spring Valley School Dist.* v. *Otsuka* (1962) 57 Cal.2d 309, 316 [19 Cal.Rptr. 479, 369 P.2d 7]; *Los*

*Angeles* v. *Los Angeles-Inyo Farms Co.* (1933) 134 Cal.App. 268, 274 [25 P.2d 224].)

The judgment and order are affirmed.

Roth, P. J., and Beach, J., concurred.